F. Stephen SERZEN

v.

**DIRECTOR OF THE DEPARTMENT OF ENVIRONMENTAL MANAGEMENT.**

No. 95–199–Appeal.

Supreme Court of Rhode Island.

April 10, 1997.

Robert Fine, Joseph DeAngelis, Providence, for Plaintiff

Mary E. Kay, Gary Powers, for Defendant

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

LEDERBERG, Justice.

The sole issue presented by this appeal and cross-appeal is whether the trial justice in the Superior Court erred in determining the fair-market value of a parcel of real estate taken by the State of Rhode Island through eminent domain. The defendant, the Department of Environmental Management (DEM), argued in its appeal that the trial justice erred by accepting expert testimony offered by the plaintiff, F. Stephen Serzan, regarding the value of the property and erred by ignoring restrictions on the property. The plaintiff in his cross-appeal countered that the trial justice erred in accepting the testimony of DEM's expert on lot size and in reducing the value of the parcel because of a private right-of-way over the property. We discern no reversible error and therefore affirm. The relevant facts and travel of this case are set forth below, with additional facts recounted as necessary in the legal analysis.

### Facts and Procedural History

In 1970, plaintiff purchased an ocean-front parcel of land in Narragansett, Rhode Island, adjacent to Scarborough State Beach. A year later, plaintiff constructed a one-story restaurant, and in 1974 added a patio room and a second-floor residential apartment. On February 22, 1989, the DEM condemned plaintiff's property as part of a project to renovate the Scarborough Beach area by improving public access to the ocean. The DEM offered plaintiff $570,405, on the basis of a lot size of 17,378 square feet. Of this amount, $70,000 was placed in escrow after the DEM discovered the existence of a private right-of-way across the property. The plaintiff rejected the DEM's offer, but accepted the $500,405 pursuant to G.L.1956 § 37–6–17, and reserved his right to petition for damages under § 37–6–18.

Accordingly, on April 17, 1989, plaintiff filed a petition for assessment of damages in which he argued that the fair-market value of the property was $1.2 million. At the bench trial on plaintiff's claim in May 1994, both parties presented expert testimony on the value of the property and the size of the lot. In September 1994, the Superior Court issued a written decision, finding the fair-market value of the property to be $816,766 as of the date of condemnation "based on a lot size of 17,378 square feet at a price of $47.00 per square foot." The trial justice then subtracted $70,000 from this amount to account for the private right-of-way. After subtracting the amount already paid and the amount assigned for the right-of-way, the DEM was found obligated to pay plaintiff an additional $246,361. Both parties appealed to this Court: the DEM argued that the trial justice erred in valuing the property at $47 per square foot; plaintiff, in a cross-appeal, argued that the trial justice erred in finding the lot size to be 17,378 square feet and erred in reducing the property's value because of the right-of-way.

### Valuation of the Property

Article I, section 16, of the Rhode Island Constitution protects the rights of property owners by providing that "[p]rivate property shall not be taken for public uses, without just compensation." It is well settled that the measure of damages to be awarded as just compensation for the condemnation of private property is the fair-market value of the property as of the date of the taking. *Ocean Road Partners v. State,* 612 A.2d 1107, 1110 (R.I.1992); *O'Donnell v. State,* 117 R.I. 660, 665, 370 A.2d 233, 236 (1977). This Court has held that the fair-market value should be determined on the basis of the most advantageous and valu-

able use of the property, sometimes called the highest and best use, that is consistent with existing land-use regulations, but compensation will not be awarded for an illegal use. *Ocean Road Partners,* 612 A.2d at 1110; *Palazzi v. State,* 113 R.I. 218, 223, 319 A.2d 658, 661–62 (1974). In the event the offer by the condemning authority is disputed and judicial relief is sought, "the litigant should receive just compensation but not a penny more." *Nasco, Inc. v. Director of Public Works,* 116 R.I. 712, 721, 360 A.2d 871, 876 (1976).

■■■ Ordinarily, the best estimates of fair-market value are the "prices paid in the open market at or about the time of the taking for substantially similar and comparable properties, when available and when proper adjustments can be made for minor differences between the properties." *J.W.A. Realty, Inc. v. City of Cranston,* 121 R.I. 374, 380, 399 A.2d 479, 482 (1979). "Significant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put." *Warwick Musical Theatre, Inc. v. State,* 525 A.2d 905, 910 (R.I.1987). The availability of comparable-sales evidence "will generally serve to exclude the use of other methods of deducing fair-market value." *Capital Properties, Inc. v. State,* 636 A.2d 319, 321 (R.I.1994).

On appeal, the DEM argued that the trial justice committed reversible error by accepting the comparable-sales testimony of plaintiff's expert appraiser, Roy Schaeffer (Schaeffer), because that testimony lacked an adequate factual basis. Quoting from this Court's opinion in *Nasco, Inc.,* 116 R.I. at 720, 360 A.2d at 876, the DEM contended that "Mr. Schaeffer's opinion 'testimony was purely a series of conclusions lacking the requisite factual basis to support them' and as such did not permit the trial court to adopt a conclusion other than the compensa-

tion determined by the State and find in favor of the Appellee." In essence, the DEM's position was that the comparable sales relied upon by Schaeffer in arriving at a valuation of the property in fact were not comparable and therefore could not form the basis of an expert opinion. The DEM further argued that its expert offered more reliable comparable-sales evidence.

At trial Schaeffer testified that he had relied upon three comparable sales in arriving at a valuation of plaintiff's property as of the date of condemnation.[1] For each sale, he provided the sales price as well as the price per square foot of land area.[2] The first comparable sale consisted of an eight-unit motel in poor condition located directly across the street from plaintiff's land, which real estate was sold in November 1988 for $450,000 or $35.70 per square foot; the second was an ocean-front seasonal recreational complex located close to Misquamicut State Beach that was sold in May 1988 for $2.1 million or $29.88 per square foot; and the third was a seasonal bait and gift shop in Westerly with a partial ocean view that was sold in December 1990 for $350,000 or $26.78 per square foot. Schaeffer testified that he adjusted the square-foot values of these comparables to account for location, lot size, proximity to ocean, and time of sale to arrive at an average value per square foot of $47 for plaintiff's property at the time of condemnation. Schaeffer's ultimate valuation of the subject property at $1.2 million was based on this valuation of $47 per square foot multiplied by an estimated lot size of 25,600 square feet.

The DEM's appraisal expert, Thomas Andolfo (Andolfo), testified that he utilized three commonly employed valuation methods—the cost approach, the direct-sales-comparison approach, and the income approach—to appraise plaintiff's property. In

---

1. Although his appraisal report, introduced as a full exhibit at trial, listed five sales for comparison purposes, Schaeffer conceded on cross-examination that he had relied on only three of the sales in appraising plaintiff's property.

2. Schaeffer stated in his appraisal report that a comparison of price per square foot of land area, as opposed to the more commonly used price per square foot of building area, was appropriate for rare ocean-front or ocean-view property because

his direct-sales comparisons,[3] Andolfo considered three comparable sales consisting of ocean-front restaurant/apartment combinations. The first, located in Westerly, sold for $647,500 in February 1989; the second, located in South Kingstown and in poor condition at the time of sale, sold for $340,000 in April 1988; and the third, located in Narragansett, sold for $125,714 in September 1984. Andolfo's appraisal report stated that the limited market for ocean-front mixed-use properties made it difficult "for the appraiser to make market derived adjustments based more on objective market observations." Nonetheless, he applied a single, nonitemized adjustment to each comparable sale after considering the location, the building size, the quality and condition, the functional utility, and, for the third property, the time of sale, to arrive at a valuation of plaintiff's property of $500,-000.

■ When reviewing the decision of a trial justice sitting without a jury in a land-condemnation proceeding, this Court accords great weight to the trial justice's findings. Consequently, we shall not disturb such findings on appeal unless it is demonstrated that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *Capital Properties, Inc.*, 636 A.2d at 323 (citing *Gorham v. Public Building Authority*, 612 A.2d 708, 712 (R.I.1992); *Fuller v. Rahill*, 120 R.I. 832, 838–39, 391 A.2d 103, 106 (1978)). The trial justice in this case considered the appraisal evidence offered by the experts and concluded:

> "[T]his Court has reviewed the testimony and reports of the expert appraisers and is persuaded by the petitioner's expert. * * * Mr. Schaeffer's analysis is based on sales more comparable in time, location, and structure than those utilized by Mr. Andolfo. Mr. Andolfo's analysis relied heavily on zoning factors not at issue due to the fact that the highest and best use of

the property was in fact a legal nonconforming use at the time of condemnation."

We are of the opinion that the trial justice carefully weighed the competing evidence of comparable sales offered by Schaeffer and Andolfo and acted well within her factfinding discretion in accepting as more persuasive Schaeffer's assessment that the property value was $47 per square foot. Moreover, we reject the DEM's contention that Schaeffer's testimony lacked a sufficient factual basis to permit meaningful review by the trial justice. Both Schaeffer's trial testimony and his appraisal report that was admitted as a full exhibit set out in great detail the facts upon which he based his appraisal of the subject property. Schaeffer's expert opinion therefore was "predicated upon facts legally sufficient to form a basis for his conclusion." *Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 312, 377 A.2d 237, 240 (1977).

■ The DEM has also argued that the trial justice erred by not taking into account land-use restrictions imposed on the property by virtue of local zoning ordinances, the Town of Narragansett Coastal Resources Overlay District and Special Flood Hazard Area Overlay District, and the jurisdiction of the Coastal Resources Management Council. *See* G.L.1956 chapter 23 of title 46. The trial justice determined that these restrictions were "not at issue" because the highest and best use of the property at the time of condemnation was its continued use as a restaurant and apartment, a legal nonconforming use that did not require the obtaining of a variance or special exception. This conclusion was amply supported by the record. Ronald F. Travers, building inspector for the town of Narragansett, testified that the property's use as a restaurant and apartment constituted a legal nonconforming use at the time of condemnation. Andolfo testified that the highest and best use of the property at the time of condemnation was its existing use as a restaurant and apartment, and Schaeffer

---

most of the value in such property is typically in the land and not in the buildings.

**3.** In performing his appraisal of plaintiff's property, Andolfo considered twenty-nine property sales and rentals, including seven "comparable land sales" and five "considered land sales" for the cost-approach analysis; three "comparable

sales," four "considered sales," and two "considered listings" for the comparable-sales analysis; and eight rentals for the income analysis. As the trial justice noted in her decision, Andolfo's comparable-sales analysis relied on only three comparable sales denominated as such.

opined that the highest and best use was "continued use as a restaurant" with "the second floor * * * converted into additional space for the restaurant." Hence, neither appraisal relied on a proscribed or speculative use. *See Ocean Road Partners v. State*, 670 A.2d 246, 250 (R.I.1996) (proscribed use may be considered as basis for fair-market value if claimant presents sufficient evidence to establish reasonable probability that such use would have been allowed in near future). Therefore, the trial justice did not err in concluding that because the appraisal of the property was based on its continued legal use as a restaurant and/or residential apartment and not on a hypothetical use that would have required obtaining a variance or a special exception that may or may not have been forthcoming, the effect of the various restrictions on the property's value was not substantially at issue.[4]

▪ The DEM also argued that the trial justice improperly ignored developmental restrictions by valuing the nondevelopable portion of the property at the same rate as the developable portion, *i.e.*, at $47 per square foot. This argument appeared to rely on the mistaken assumption that the evidence establishing the figure of $47 per square foot applied only to the land on which the building was situated. In reviewing the record before us, however, we are of the opinion that the trial justice properly considered the fact that not every square foot of the property was developable. First and foremost, the trial justice was plainly aware that both parties appraised the property on the basis of its existing use at the time of condemnation and that this use consisted of a building on part of the land with the rest of the property remaining undeveloped. Second, the trial justice described Schaeffer's testimony as establishing that the "*average* value per square

foot was $47.00," a statement that acknowledged that each square foot was not equal in value. (Emphasis added.) In addition, Schaeffer testified that he took lot sizes into account in his comparable-sales analysis and that "large lots tend to have lower sales prices per square foot." Andolfo also acknowledged this general rule and termed it the "economy of scale" principle. *Cf. Ocean Road Partners*, 612 A.2d at 1110 (describing related principle whereby "the value of property increases if the property is densely zoned").

▪ The DEM also maintained that Schaeffer's appraisal should have been rejected because it failed to comply with professional standards promulgated by the American Appraisal Institute. But the DEM has offered no authority for the proposition that noncompliance with professional standards automatically requires the total rejection of expert testimony, regardless of the degree or materiality of the noncompliance. The only noncompliance specifically alleged by the DEM was that Schaeffer had failed to incorporate into his appraisal analysis the fact that plaintiff's property was listed for sale at the price of $525,000 from late 1986 through summer 1987. According to the DEM, this failure violated Standard Rule 1–5(a) of the Standards of Professional Appraisal Practice of the Appraisal Institute, which provides that an appraiser must, in developing a real property appraisal, "consider and analyze any *current* Agreement of Sale, option, or listing of the property being appraised, if such information is available to the appraiser in the normal course of business." (Emphasis added.) In this case, the listing occurred in 1986 and 1987, whereas the condemnation took place in February 1989. The listing was therefore not current and fell outside the mandate of the rule.

---

**4.** The DEM suggested that plaintiff's appraisal was based on the value of the property as a McDonald's fast-food restaurant, a use that the DEM described as "purely fanciful and not consistent with the zoning restrictions at the time of the condemnation." Although it is true that Schaeffer included in his comparable-sales analysis the sale of a lot to be used for a McDonald's restaurant and even concluded his report by remarking on the coincidence that his valuation of the property at $1.2 million was roughly compa-

rable to what McDonald's had offered to pay for plaintiff's property in 1986 (according to plaintiff), we are persuaded that the trial justice valued the property on the basis of its use at the time of condemnation and not on its arguably speculative conversion into a fast-food-chain restaurant. We note that Schaeffer acknowledged at trial that the McDonald's sale listed in his report was not comparable and that he relied only on the three comparable sales described above.

Moreover, evidence of the listing was presented to the trial justice, along with Schaeffer's testimony that the marketability of the property at the time of the listing would have been negatively affected by its anticipated condemnation.

## Size of the Property

On cross-appeal, plaintiff argued that the trial justice erred in accepting the testimony of the DEM's engineer regarding the size of plaintiff's property. The plaintiff's engineer and land surveyor, Joseph W. Frisella (Frisella), testified that to a reasonable degree of engineering certainty, the size of the lot on the date of condemnation was 25,600 square feet. He further testified that he conducted surveys of the lot in 1970, 1988, 1991, and 1994 and that the results of these surveys were "quite consistent" with the figure of 25,600 square feet.[5] Of the three complete surveys he conducted, the 1988 survey yielded a result of 25,600 square feet, the 1991 survey was "between two to three hundred feet less," and the 1994 survey was "[i]n the vicinity of a thousand square feet less." On cross-examination, however, Frisella acknowledged that the measurements contained in the 1970 deed of conveyance yielded a land area of only 10,632 square feet. Moreover, plaintiff himself listed the area of the lot as 11,297 square feet in a 1986 building-permit application admitted as an exhibit at trial. The DEM's expert engineer, L. Robert Smith (Smith), testified that plaintiff's lot contained 17,378 square feet in 1988. On cross-examination, however, he admitted that a survey conducted by his firm during the trial yielded an area of 24,232 square feet. He explained that erosion and shifting sand can cause the mean high-water line to move substantially and agreed that the "dimensions of the subject property could be expected to fluctuate every single day." This explanation was consistent with plaintiff's own answer to an interrogatory in which he stated that "historically the beach here has actually increased in size in past decades."[6]

■ The trial justice in this case, sitting as factfinder, determined the relative weight of the conflicting testimony concerning lot size and concluded, "Taking into account that ocean front property may erode or ac[c]rete, this Court finds, based on the competent evidence before it, that the lot measured 17,378 square feet at the time of condemnation." *See Warwick Musical Theatre, Inc.,* 525 A.2d at 911. Because this finding was supported by the record, we conclude that the trial justice did not err in rejecting plaintiff's proposed lot size.

## Impact of Right–of–Way

■ Finally, the plaintiff argued that the trial justice erred by reducing the property's value by $70,000 to account for the presence of a private right-of-way across the property.[7] The plaintiff testified that the right-of-way had "no negative impact whatsoever" because the public was invited onto the property. The plaintiff's expert, Schaeffer, testified that "[c]ommercial properties in general do not suffer losses in value from rights-of-way of this type because they're looking to have people travel across their

5. Frisella acknowledged that the 1970 survey was for the purpose of siting plaintiff's building and was not a "complete survey" for the purpose of calculating land area.

6. The plaintiff argued that his property was "clearly eroded" by the DEM's construction in 1988 of an enhanced storm-drainage system and spillway that greatly increased the water flow bordering plaintiff's property. The existence of this drainage system, according to plaintiff, made it improbable that the property grew from 17,378 square feet in 1988 to 24,232 square feet in 1994 as suggested by Smith's testimony. Smith testified, however, that the drainage could either increase or decrease the size of the lot, depending upon whether it was "fast velocity" or "slow velocity." No one testified that the new drainage

system would necessarily have had the effect of decreasing the size of plaintiff's property.

7. The DEM argued that this claim was not preserved for appeal because title issues were not litigated at trial. The plaintiff, however, has not disputed the existence of an encumbrance on his title. Rather, plaintiff argued at trial and on appeal that the existence of the right-of-way did not affect the value of the property and hence should not have been a factor in fixing compensation for the taking. In the parties' escrow agreement, plaintiff specifically reserved the right to raise this argument, and by raising it before the trial justice and this Court on appeal, he properly preserved the issue for our consideration.

property." Schaeffer, however, agreed with the statement that "the existence of such a right-of-way would indeed reduce the value of the property if it were to be used as a residential property." In denying the plaintiff's motion to amend, the trial justice noted that Schaeffer had admitted that the existence of a right-of-way would reduce the value of residential property and that the DEM had valued the 1,860–square–foot right-of-way at $37.63 per square foot. Therefore, the trial justice relied on competent evidence to support her decision to subtract $70,000 from the award because of the existence of the right-of-way, and we affirm that determination.

In summary, we deny the defendant's appeal and the plaintiff's cross-appeal and affirm the judgment of the Superior Court, to which we remand the papers in this case.