DECISION
Before this Court is a consolidated appeal from several decisions of the Lincoln Board of Tax Assessment Review (The Board or The Town), denying General Cable Co's (General Cable or appellant) requests for reductions of the assessed value of its industrial property located in Lincoln. Jurisdiction is pursuant to G.L. 1956 § 44-5-26.
 FACTS/TRAVEL
General Cable Co, Inc., (Appellant or General Cable) is the owner of an insulated copper wire manufacturing facility located on a thirty-three (33) acre improved lot at three (3) Carol Drive and known as Lots 105, 163, and 164 on Assessors Plat 28 in the Land Evidence Records for the Town of Lincoln (The Property). On December 31, 1991 the Town of Lincoln conducted a re-evaluation of local properties, assessing the Property's fair market value (FMV) at $7,360,280. Subsequently, the Town assessed the Property at the following rates, to all of which the appellant objected. On December 31, 1993, the Town increased the assessed value of the Property to $8,861,400, taxing it at a rate of $20.49 per $1000 of assessed value; the resulting taxes paid by the appellant that year were $181,570. Beginning on December 31, 1996, and continuing through the years 1997, 1998, and 1999, the Town re-assessed the Property at $7,944,800, taxing it at a rate of $22.88 per $1000 of assessed value in 1996 and $24.55 from 1997 through 1999. The resulting taxes paid by the appellant in those years were $181,777 in 1996, and $195,045 from 1997 through 1999. Finally, on December 31, 2000, the Town reduced the assessed value of the Property to $6,827,900, taxing it at a rate of $23.98 per $1000 of assessed value; the resulting tax paid by the appellant in that year was $163,733. Consequently, the appellant timely paid the assessed taxes for those years and timely filed separate appeals with this Court challenging the Town's assessment of the Property's FMV, as well as the resulting tax.
In November 2002, this Court held a non-jury trial. At trial, the appellant argued that the Town used the singularly unreliable Cost Method to calculate the Property's FMV, resulting in an artificially high figure on which its tax assessments for the disputed years were based. In support of its argument, General Cable proffered the testimony of commercial real estate expert Andrew L. Froling, (Froling) Appraiser/Executive Vice President for International Appraisal Co. (International), who conducted the appraisal of the Property and compiled an exhaustive one hundred-forty three (143) page, self-contained appraisal report.[1] Utilizing the Comparative Sales, Income, and Cost Methods of real estate appraisal, Froling estimated the Property's FMV at $5,000,000 for 1993 through 1995, and $4,650,000 for 1996 through 2000. In his testimony before the Court, Froling, at length, detailed the methodology behind each appraisal method and why his application of those methods returned the specific FMV numbers that they did.
Alternatively, testifying on behalf of the appellee, Peter M. Scotti, Appriaser/President for Peter M. Scotti Assoc. Inc., (Scotti), a local real estate appraiser presented a briefer survey of the Property and compiled a "Consulting Report" (Report), as opposed to a formal written appraisal similar to Froling's.[2] In his testimony, Scotti relied heavily on the figures, calculations, and methods used in the Report. While considering the applicability of the Comparative Sales, Income, and Cost Methods, Scotti placed particular emphasis on the Income Method; he noted the lack of comparable properties in relation to the Property as the principal reason for not utilizing the Comparable Sales Method and the unreliability of computing structure depreciation as the principal reason for not seriously considering the Cost Method. Ultimately, Scotti estimated the FMV of the Property at $7,599,905 for 1993; $7,933,967 for 1996; $8,022,122 for 1997; $7,779,840 for 1998; $7,617,760 for 1999; and, $7,462,295 for 2000.
 STANDARD OF REVIEW
Aggrieved parties may appeal an assessment of taxes against them to this Court pursuant to G.L. 1956 § 44-5-26, which provides in pertinent part:
 (a) Any person aggrieved on any ground whatsoever by any assessment of taxes against him or her in any city or town . . . and under obligation to pay more than one-half of the taxes thereon, may within ninety (90) days from the date of the first tax payment is due file an appeal in the local office of tax assessment . . . . The assessor has forty-five (45) days to review the appeal, render a decision and notify the taxpayer of the decision. The taxpayer, if still aggrieved may appeal the decision of the tax assessor to the local tax board of review . . . . Appeals to the local tax board of review are to be filed not more than thirty (30) days after the assessor renders a decision and notifies the taxpayer . . . . The local tax board of review shall, within ninety (90) days after the expiration of the filing of the appeal, hear the appeal, and render a decision within thirty (30) days of the date that the hearing was held . . . . G.L. 1956 § 44-5-26.
Pursuant to G.L. 1956 § 44-5-26, a taxpayer may then appeal a taxing authority's final decision to the Superior Court. deBourgknecht v.Rossi, 798 A.2d 934, 936 (R.I. 2002) (supporting an aggrieved taxpayer's right of appeal of a taxing authority's final decision to the Superior Court pursuant to G.L. 1956 § 44-5-26). Also, it is well settled that "a taxpayer who challenges the legality of the assessment or claims that the assessor used an inappropriate fair market value of the subject property has the burden of presenting evidence of fair market value.Cummings v. Shorey, 761 A.2d 680, 687 (R.I. 2000).
FAIR MARKET VALUE
The appellant first argues on appeal that the Town's exclusive reliance on the Cost Method for calculating FMV returned inflated assessment figures for the Property for 1993, as well as 1996 through 2000. The appellant further contends that Scotti's appraisal of FMV was no less flawed, principally because of his lack of the necessary familiarity with the Property. In contrast, the appellee, while conceding that the tax assessor's methodology for FMV calculation may have been flawed, argues that Scotti's appraisal, nevertheless, represents a more accurate depiction of the Property's FMV than does Froling's.
Although there is no rigid criteria for the determination of FMV, it is well accepted in our jurisprudence that the "preferred method for ascertaining the fair market value of land . . . is the comparable sales method." Capital Properties, Inc., v. State, 636 A.2d 319, 321 (R.I. 1994). When utilizing this method, the appraiser compares the subject property with "substantially similar and comparable properties," examining the prices paid on the open market for the latter properties. Serzen v.Director of Environmental Management, 692 A.2d 671, 674 (R.I. 1997). Thus, "[p]roperty similarly situated need not exactly conform to the property in suit, as similarity does not mean identical, but having a resemblance." 8A Patrick J. Rohan and Melvin A. Reskin, Nichols onEminent Domain § 21.04 (3d ed. 2001); see also Inn Group Associatesv. Booth, 593 A.2d 49, 51 (R.I. 1991). The Rhode Island Supreme Court has noted that "[s]ignificant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put." WarwickMusical Theater v. State of Rhode Island, 525 A.2d 905, 910 (R.I. 1987). If no comparable properties exist, or if the property is somehow unique, a departure from the Comparative Sales Method to either the Income or Cost methods is permissible. Id. (where a musical theater accommodating various entertainment acts was unique and no comparable sales were available).
Consequently, for a trial justice sitting without a jury the preferred method for calculating FMV when taxpayers appeal decisions of local boards of tax assessment review to the Superior Court is the Comparative Sales Method. Capital Properties, 636 A.2d at 322. Although having significant discretion to determine FMV, the Court should attempt to ascertain the "highest and best use" of the property which often reveals what the current market dictates that property so used is truly worth.See Serzan, 692 A.2d at 673-674 (defining highest and best use as "the most advantageous and valuable use of the property"); see also 26 Am. Jur.2d Eminent Domain § 322 (1996). The Court may depart from the Comparative Sales Method for determining FMV if the subject property is "unique or special purpose." Warwick Musical Theater, 525 A.2d at 910. It is therefore within the trial justice's discretion to determine whether such comparable sales exist and that finding will not be reversed unless "palpably or grossly wrong." Id. Ultimately, after considering all the evidence and testimony, the Court makes a credibility determination regarding which evidence is more convincing. Warwick Musical Theatre, 525 A.2d at 911.
In the present case, the Court has been presented with a self-contained Appraisal Report compiled by Froling and a "consulting report" coupled with oral testimony from Scotti. Both appraisals differ not only in their final tabulations of FMV but also in their relative comprehensiveness. Froling began his appraisal by outlining the location of the Property in relation to major highways and points in Rhode Island, then relating its various vital statistics such as chain of title and assessments and taxes for 1993 to 2000, as well as a discussion of his understanding of FMV and his conclusion that the Property's highest and best use is an "Industrial/Manufacturing and Warehouse Building." See generally FrolingReport at 4-32. Additionally, Froling's report provides a general overview of the Rhode Island economy, as well as a discussion of the state's industrial real estate sector.[3]
Froling began his appraisal with the Comparative Sales Method, briefly noting that this method reflects "the principle of substitution, i.e., that a typically motivated, well informed buyer will pay no more for a property than it would cost to acquire a similar property with the same utility." Id. at 74. Thus, "taken alone, no single one of these buildings that have sold could establish a reliable indication of the market value of the property. Taken together, however, these dozen sales do provide a good indication [of] what the typical purchaser would likely pay . . . ."Id. Accordingly, Froling compared the sales of twelve (12) buildings to the Property, all of which sold in the last eleven (11) years.[4]
Froling examined four buildings, for example, not because of their particular similarity to the Property, but rather because they were situated in the same industrial park as it.[5] Specifically, Comparable sale number three (comp #3) was a 65,000 square foot industrial building which sold for $1,175,000 at $18.08 per square foot. A nine percent (9%) upward adjustment was made for the date of sale, while a substantially large thirty-five percent (35%) downward adjustment was made for the building's small size in relation to the Property. Ultimately, Froling estimated the adjusted sales price of comp #3 at $824,850 and $12.69 per square foot. As a caveat, Froling noted that this particular comparable was "not really comparable because it is so much smaller [than the Property]." Froling Report at 80. Similarly, comparable sale number four (comp #4) was a much smaller industrial building than the Property at 56,000 square feet. This building sold for $900,000 at $17.65 per square foot. An eleven percent (11%) upward adjustment was made for date of sale, a five percent (5%) downward adjustment was made for quality, while the largest was a thirty-five percent (35%) downward adjustment for the building's small size. Froling's adjusted sale price for comp #4 was $616,883 and $11.02 per square foot. In the same vein as its predecessors, comparable sale number five (comp #5) was a small 40,000 square foot industrial building which sold for $700,000 at $17.50 per square foot. A fourteen percent (14%) upward adjustment was made for the date of sale and a forty percent (40%) downward adjustment was made for the building's small size. Froling estimated the building's adjusted sale price to be $478,800 and $11.97 per square foot. Comparable sale number six (comp #6) was a 144,000 square foot industrial building which sold for $2,600,000 at $16.12 per square foot. A ten percent (10%) downward adjustment was made for quality, a five percent (5%) downward adjustment was made for condition, a two percent (2%) upward adjustment was made for date of sale and a twenty percent (20%) downward adjustment was made for the building's smaller size. The adjusted sale price was estimated at $1,813,968 and $12.60 per square foot.
Froling also examined properties that shared many structural similarities with the Property, but were situated on much larger lots. Here, Froling believed that although some adjustments were needed for the larger land area, ultimately, these properties were comparable. Thus, Froling explained that the sales prices and price per square foot of each one was adjusted downward because of the surplus land. Comparable sale number one (comp #1), for example, was a 96,800 square foot industrial building located in Smithfield, and selling for $2,250,000 at $23.34 per square foot. Froling made a six percent (6%) upward adjustment for the date of sale, five percent (5%) downward adjustments for quality and condition, and most notably, a thirty percent (30%) downward adjustment for its land area and a twenty-five percent (25%) downward adjustment for its smaller size. Although the building was much smaller than the Property, Froling once again included it as a comparable sale because of its close proximity to the latter. Froling calculated that after all necessary adjustments, comp #1's adjusted sales price was $1,130,043 and its adjusted price per square foot was $11.67. Similarly, comparable sale number eleven (comp #11) was a 175,000 square foot industrial building which sold for $1,750,000 at $10.00 per square foot. A three percent (3%) upward adjustment was made for date of sale, a five percent (5%) upward adjustment was made for quality, a fifteen percent (15%) downward adjustment was made for building size, a twenty percent (20%) upward adjustment was made for location, while a twenty-five percent (25%) downward adjustment was made for the surplus land area. The adjusted sale price was $1,447,858 at $8.27 per square foot. Comparable sale number twelve (comp #12) was a 332,608 square foot industrial building which sold for $3,300,000 at $9.92 per square foot. A twelve percent (12%) upward adjustment was made for date of sale while a ten percent (10%) downward adjustment was made for surplus land area. The adjusted sale price was $3,492,720 at $10.50 per square foot.
Finally, Froling examined other industrial properties that helped round out his analysis of comparable sales in the state. Comparable sale number two (comp #2), a 115,830 square foot industrial building located in East Providence sold for $2,240,000 at $19.34 per square foot. A ten percent (10%) upward adjustment was made for the date of sale, five percent (5%) downward adjustments were made for the building's location, quality, and condition, while the largest was a twenty-five percent (25%) downward adjustment for building size. Froling estimated an adjusted sales price of $1,584,429 and $13.67 per square foot. Comparable sale number seven (comp #7) was a 245,000 square foot industrial building located in Cumberland which sold for $3,000,000 at $12.24 per square foot. A nineteen percent (19%) upward adjustment was made for date of sale and a ten percent (10%) downward adjustment was made for the building's slightly smaller size in relation to the Property. Froling calculated the adjusted sale price to be $3,213,000 at $13.11 per square foot. Comparable sale number eight (comp #8) was a 98,275 square foot industrial building located in Coventry which sold for $1,200,000 at $12.21 per square foot. A thirteen percent (13%) upward adjustment was made for the date of sale, a ten percent (10%) upward adjustment was made for location, a five percent (5%) upward adjustment was made for quality, and the largest was a twenty-five percent (25%) downward adjustment for the building's smaller size. The adjusted sale price for comp #8 was estimated to be $1,174,635 at $11.95 per square foot. Comparable sale number nine (comp #9) was another industrial building located in Coventry measuring 300,000 square feet which sold for $3,048,000 at $10.16 per square foot. Five percent (5%) upward adjustments were made for date of sale, location, and condition, while a five percent (5%) downward adjustment was made for building size. The adjusted sale price was estimated at $3,352,019 and $11.17 per square foot. Comparable sale number ten (comp #10) was a 203,650 square foot industrial building located in Coventry which sold for $2,050,000 at $10.07 per square foot. An upward adjustment of six percent (6%) was made for date of sale, a ten percent (10%) upward adjustment was made for location, a ten percent (10%) downward adjustment was made for building size and a five percent (5%) upward adjustment was made for condition. Froling estimated the adjusted sale price at $2,258,834 at $11.09 per square foot.
Based on the comparable sales data, Froling estimated that the FMV of the Property for 1993, 1994, and 1995 was $5,000,000 to $5,031,728 at $13.00 per square foot, for 1996 it was $4,644,672 to $4,650,000 at $12.00 per square foot, and for 1997 to 2000 it remained at $4,650,000 at $12.00 per square foot. Id. at 104.
Next, Froling utilized the Income Method, which he described as "a three step process." Id. at 105. Specifically, he began by
 "analyz[ing] the gross rental income which a property is capable of producing within its market area. The second step is to make deductions to allow for vacancies and all operating expenses, including maintenance, a reserve for repairs and replacements, and management. The third . . . step . . . is to discount to its present worth the net rental income anticipated from the property at a future point in time. Discounting . . . is accomplished by the application of an overall capitalization rate . . . A capitalization rate that is determined by the Ellwood Mortgage Equity Method . . . is the most reliable method because it includes consideration for, and specifies, all of the underlying variables. " Id. at 105.
Within that three tiered analysis, one must also determine the applicable market rent of the property — itself, another multi step approach.Id. For this analysis, Froling used four comparable rentals. Comparable rental number one (rental #1) was a 60,000 square foot industrial building located in Lincoln which rented between $2.00 and $3.00 per square foot from 1993 to 1998. A fourteen percent (14%) upward adjustment was made for the date of lease rent, a ten percent (10%) downward adjustment was made for quality and a thirty-five percent (35%) downward adjustment was made for the building's smaller size. Froling estimated rental #1's adjusted rental rate at $1.33 per square foot. Comparable rental number two (rental #2), was a 51,000 square foot industrial building located in Providence, which rented at $2.50 per square foot in 1998. A four percent (4%) upward adjustment was made for date of lease rent, a ten percent (10%) downward adjustment was made for location, and a thirty-five percent (35%) downward adjustment was made for building size. The adjusted rental rate was $1.52 per square foot. Comparable rental number three (rental #3) was a 115,830 square foot industrial building located in East Providence, which rented for $2.70 per square foot in 1995. A ten percent (10%) upward adjustment was made for date of lease rent, five percent (5%) downward adjustments were made for location, quality and condition, while a twenty-five percent (25%) downward adjustment was made for the building's smaller size. The adjusted rental rate was $2.01 per square foot. Comparable rental number four (rental #4) was a 332,608 square foot industrial building located in East Providence, of which 100,000 square feet could be leased. It rented for $1.75 per square feet in 1995. A ten percent (10%) upward adjustment was made for date of lease rent, and a twenty-five percent (25%) downward adjustment was made for building size. The adjusted rental rate was $1.45 per square foot.
Based on the comparable rental data he compiled, Froling estimated that "the typical purchaser would conclude that the market rent for the subject property was $2.00 [per square foot] . . . ." Id at 111. Accordingly, Froling multiplied this rate by 387,056 square feet (the size of the Property) less various allowances for expenses and vacancies, arriving at a net operating income of $560,845 for the Property. This figure was then multiplied by a capitalization rate of 11.22% so as to arrive at a final rounded FMV of $5,000,000 from 1993 to 1995, and using the same calculations, $4,620,000 from 1997 to 2000.[6]
Finally, Froling used the Cost Method, which involved estimating the FMV of the land upon which the Property was situated and adding this figure to an estimation of the replacement cost of an entirely new building before any depreciation or other deductions. Froling Report at 127. Accordingly, Froling compared four land sales to calculate the FMV of the land. Comparable land sale number one (land sale #1) was a 8.14 acre lot located in Lincoln, which sold for $425,000 at $52,210 per acre. Comparable land sale number two (land sale #2) was a 9.97 acre lot located in Lincoln, as well. This lot sold for $600,000 at $60,180 per acre. Comparable land sale number three (land sale #3) was a 21.65 acre lot located in Smithfield, which sold for $1,623,750 at $75,000 per acre. Finally, comparable land sale number four (land sale #4) was a 10.00 acre lot, which sold for $750,000 at $75,000 per acre. Based on this data, Froling observed that "considering the much larger size of the subject site, we believe that the typical purchaser would conclude that the indicated unit value of the subject site is $50,000 per acre." Id. at 126. Multiplying this figure by 33.92 acres returned a rounded FMV of $1,700,000 for the Property as vacant land.
Next, Froling employed two distinct methods for calculating accrued depreciation: specifically, he used the Economic Age-Life and the Income Capitalization methods.[7] With both methods, Froling factored in the vacant land value estimation and ultimately arrived at a current FMV of $5,020,000 using the Economic Age-Life Method and a FMV of $5,000,000 using the Income Capitalization Method. For 1996 to 2000, Froling estimated the FMV at $4,605,000 using the Economic Age-Life Method and $4,620,000 using the Income Capitalization Method.
After considering all the data returned by the three major approaches used, Froling ultimately concluded that the FMV for 1993 to 1995 was $5,000,000. For 1996 to 2000, Froling determined the FMV to be $4,650,000.
Scotti's appraisal, however, differed significantly from Froling's and ultimately returned appreciably higher figures. Beginning with a short description of the subject property, Scotti briefly discussed the three accepted methods for determining FMV: namely, the Comparative Sales, the Income, and the Cost methods.[8] Of the three approaches, Scotti used both the Cost and Income methods; however, he did not use the Comparative Sales Method. In his report, Scotti remarked of the Comparative Sales Method's applicability:
 "Between December 31, 1993 and December 31, 2000, the geographic area searched was the State of Rhode Island. Between 1991 and 1994, the Sales Comparison Approach was difficult to employ due to the lack of sales activity. In subsequent years, the lack of sales activity of large industrial properties continued and made application of the Sales Approach questionable." Scotti Report at 24.[9]
At trial, the nature of Scotti's appraisal was raised, and he testified that he had not viewed the Property until two days into the proceedings.See supra note 8. Scotti also acknowledged under cross-examination that he did not have much time to look for comparable properties and that his final appraisal was certified during a lunch break at trial. During his testimony, it became apparent that the amount of time Scotti had devoted to appraising the Property paled in comparison to that of Froling, who had several months to compile his final self-contained written appraisal. Although each of Froling's twelve (12) comparable sales was not identical to the Property, and some required one or more adjustments for various differences, the Rhode Island Supreme Court has held that strict similarity is not necessarily a prerequisite to comparability of properties. Inn Group Associates 593 A.2d at 51. As both Froling and Scotti acknowledged at trial, the learned skill of commercial real estate appraisal often calls upon the practitioner to exercise a certain degree of subjective judgment, especially in the context of adjustments for differences between comparable properties. Froling, possessing thirty (30) plus years of practical experience, provided a comprehensive appraisal of the property buttressed by informative testimony. This Court is satisfied that Froling adequately adjusted for differences among the comparable properties used in his report. Thus, the Court finds that the properties used by Froling in his Comparative Sales approach were sufficiently similar to the subject and were ultimately representative of properties that a ready, willing, and able buyer would consider in entering into an arms length transaction for the Property. Notably, comp #7, comp #9, and comp #12 were particularly analogous to the Property in size and location. Conversely, this Court finds Scotti's determination of FMV, obtained without use of the well-accepted Comparative Sales Method, less credible.
In using the Cost Method, Scotti estimates the FMV of the Property by calculating the replacement cost new of the Property, minus an estimation of accrued depreciation plus site improvements and land value. Ultimately, this methodology returned FMV figures of $7,531,739 at $19.45 per square foot for 1993; $7,546,282 for 1996 to 1998; and $7,630,955 for 1999 to 2000. Unlike Froling's Cost Method calculations, Scotti's methods lacking detail and sufficient explanation, leave lingering questions regarding how he arrived at certain figures. For example, while Froling compared four separate land sale transactions in estimating the underlying FMV of the Property as if vacant, Scotti appears to have omitted this step. If this omission is permissible in his use of the Cost Method, Scotti does not make it clear why. Ultimately, it is unclear to this Court how Scotti arrived at the figure of $1,700,000 for the FMV of the land as vacant. Similarly, this Court can only speculate as to how Scotti arrived at the accrued depreciation value of $3,520,680 for the Property. While he enumerates a series of numerical calculations that led him to this figure, there is a notable dearth of explanatory analysis. Alternatively, Froling, in his report, repeatedly makes the reader aware that he was using both the Economic Age-Life and Income methods and the precise values returned by each; Scotti, on the other hand, does not. Furthermore, Scotti provides little if any explanation underlying the mathematical calculations that he used to estimate FMV. Accordingly his estimates of the Property's FMV at $7,531,739 in 1993; $7,546,282 from 1996 to 1998; and $7,630,955 from 1999 to 2000 via the Cost Method are severely diminished by the confluence of these shortcomings and, as a result, are not convincing.
Finally, Scotti used the Income Method to estimate FMV; however, he again provides little explanation regarding how he arrived at the current market rent for the Property, other than to simply state "the market rent for the subject is projected on current rents paid and asked for comparable space.[10] Analysis of the rental data indicates that the subject would lease on an `as is' basis between $2.50 and $3.00 per square foot . . . ." Scotti Report at 21. Unlike Froling's appraisal, Scotti's does not indicate whether he measured the Property against actual comparable rentals. Again, this Court can only speculate as to how Scotti accurately calculated the applicable market rental rate, which is ostensibly an integral component of the Income Method. Scotti also provides comparatively little guidance on how he arrived at the overall capitalization rate. While his report includes an appendix of annual, overall capitalization rates, his appendix is somewhat analogous to arriving at a mathematical result without showing the calculations that produced it. Accordingly, this Court finds Scotti's calculations of the Property's FMV at $7,599,905 in 1993; $7,933,967 in 1996; $8,022,122 in 1997; $7,779,840 in 1998; $7,617,760 in 1999; and $7,462,295 in 2000, which are not supported by the evidence before this Court, to be unpersuasive.
 CONCLUSION
After hearing all the testimony and conducting a careful, independent review of all the evidence before it, this Court accepts Froling's appraisal of FMV. Froling presented a voluminous amount of data to support his ultimate conclusions, and at each stage of the appraisal, he meticulously documented the process he was using and why he did so. Scotti, on the other hand, presented a cursory appraisal of the Property, lacking a complete analysis of current market conditions and comparable properties. Accordingly, this Court finds Froling's appraisal for 1993 to 1995 of $5,000,000 and of 1996 to 2000 of $4,650,000 adequately represented the FMV of the Property for those years. As such, this Court determines the FMV for 1993 to 1995 to be $5,000,000 and the FMV for 1996 to 2000 to be $4,650,000.
Counsel shall prepare an appropriate order for entry.
[1] According to Froling, the designation "self-contained appraisal report" is a type of appraisal report recognized by the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Standards Board of the Appraisal Foundation, which "has been authorized by Congress as the source of appraisal standards and appraisal qualifications." Froling Report at ii.
[2] At trial, Scotti related that while the "Consulting Report" complied with USPAP, it was not to be considered a formal written appraisal. Furthermore, Scotti testified that his oral testimony before the Court could properly serve as a formal appraisal consistent with USPAP guidelines.
[3] Froling has provided industrial real estate data for 1996 to 2001 obtained from the Society of Industrial and Office Realtors (SIOR) which, in 1996, began compiling price per square foot data for various sized industrial buildings in Rhode Island.
[4] In his testimony, Froling noted that in the industrial real estate sector the time span between a comparable sale and a subject property's appraisal may be much longer than similar comparisons in a residential context, often because the latter are far more common than the former.
[5] At trial, Froling noted that he included several nearby properties as comparable sales primarily because of their close proximity to the Property. He stated that since the ultimate goal of the Comparative Sales Method is to approximate what a potential buyer would pay for similar properties, such purchasers often inquire about the selling price of properties.
[6] In addition to using the Ellwood Mortgage Equity Method for determining the capitalization rate, Froling also applied the Band Investment and Debt Coverage Methods, which appear to be simplified versions of Elwood's complex algebraic formulas. The use of all three methods returned essentially the same 11.22% capitalization rate.
[7] Although he utilized both methods for calculating accrued depreciation, Froling believed that "the income capitalization method . . . is generally the best way to measure the total value lost, that an industrial or commercial property has lost." Froling Report at 132. Froling opined that the depreciation figures of the Income Capitalization Method are supported by current market data, whereas Economic Age-Life data is based on a less reliable straight-line theory of depreciation.Id at 132-133.
[8] As to the very brief nature of both Scotti's description of the property and his overall report, the Court notes that neither he nor any of his associates had viewed the Property in relation to his appraisal prior to accompanying this Court on a tour during the course of the present trial.
[9] Although Scotti lists four properties in Lincoln as `comparable sales', by his own admission they were "not reliable enough to render an opinion of value," and the Comparative Sales Method was effectively "excluded from the analysis." Id.
[10] Under cross-examination at trial, Scotti acknowledged that there were several mathematical errors in his Income calculation of FMV. Essentially, Scotti described these errors as "re-do's" done midway through this trial.