DECISION
Before this Court is a consolidated petition for damages resulting from the Providence Redevelopment Agency's (the "Agency" or "respondent") condemnation of a parcel of real estate owned by Rhode Island Properties, LLC (the "petitioner"). Jurisdiction is pursuant to G.L. 1956 § 45-32-34.
 FACTS/TRAVEL
On May 3, 2000, the Agency acquired, by eminent domain, property owned by the petitioner and located at 280 Academy Avenue in the City of Providence, also known as Lot No. 653 on Assessor's Plat 64 in the Land Evidence Records of the City of Providence (the "Property").
Previously, on May 2, 2000, the Agency filed a petition in the Superior Court seeking an order declaring the amount of just compensation for the seizure to be $16,800, and on the same date, the Court determined that said amount did justly compensate the petitioner for the taking by the Agency.
On September 24, 2001, the Superior Court issued a consent order wherein both the petitioner and the respondent agreed that the sum of $16,400 should be paid to the petitioner "without prejudice to seek additional compensation" for the property. Consent Order of September24, 2001 at 1.
On October 16, 2001, the Superior Court issued a second consent order, wherein the petitioner and respondent agreed that the sum of $400 should be paid to the petitioner "without prejudice to seek additional compensation" for the property. Consent Order of October 16, 2001 at 1. The petitioner, however, avers that the sum of $16,800 does not constitute just compensation for the taking and has presented this Court with an appraisal conducted by Joseph W. Accetta Associates, Inc., wherein Mr. Joseph W. Accetta ("Accetta") estimated the fair market value ("FMV") of the Property to be $41,500. Alternatively, the Agency commissioned Mr. Thomas S. Andolfo ("Andolfo") of Andolfo Appraisal to prepare a `restricted use appraisal'[1] estimating the Property's FMV. Accordingly, Andolfo estimated the Property's FMV at $16,800.
On October 26, 2001, the petitioner filed a motion to expedite proceedings with this Court, which was subsequently granted.
 FAIR MARKET VALUE
It is well-settled in our jurisdiction that certain government agencies in Rhode Island are vested with the power to condemn private property and later acquire it, with some limitations, pursuant to G.L. 1956 §45-32-24. One of the principal limitations on this power is that the landowner whose property has been taken is due just compensation from the acquiring agency. R.I. Const Art I § 16. Most often, a justly compensable amount is arrived at by assessing the FMV of the property at the time of the taking. Although there are no rigid criteria for determining FMV, it is generally agreed that the "preferred method for ascertaining the fair market value of land taken by condemnation is the comparable sales method." Capital Properties, Inc., v. State, 636 A.2d 319
(R.I. 1994). The appraiser compares the condemned property with "substantially similar and comparable properties," examining the prices paid on the open market for the latter properties. Serzen v. Director ofEnvironmental Management, 692 A.2d 671 (R.I. 1997). It is often said that "[p]roperty similarly situated need not exactly conform to the property in suit, as similarity does not mean identical, but having a resemblance." 8A Patrick J. Rohan and Melvin A. Reskin, Nichols onEminent Domain § 21.04 (3d ed. 2001); see also Inn Group Associatesv. Booth, 593 A.2d 49, 51 (R.I. 1991). The Rhode Island Supreme Court has noted that "[s]ignificant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put." WarwickMusical Theater v. State of Rhode Island, 525 A.2d 905, 910 (R.I. 1987). If no comparable properties exist, or if the property is somehow unique, a departure from the Comparative Sales Method to either the Income or Cost methods is permissible. Id. (Where a musical theater accommodating various entertainment acts was unique and no comparable sales were available).
While the agency taking the condemned property is required to estimate fairly its FMV, the trial justice sitting without a jury engages in a similar analysis if the landowner petitions the Court to review the condemning agency's estimate. Although the trial justice has discretion in determining the FMV of the property taken, some relevant factors can assist the Court. Specifically, the Court should attempt to determine the "highest and best use" of the property in ascertaining what the present market dictates property so used is truly worth. 26 Am. Jur.2d EminentDomain § 322 (1996). Additionally, the trial justice should "place the owner . . . in a position as good as, but not better than the position the owner was in before the taking occurred." 26 Am. Jur.2dEminent Domain § 295 (1996) (quoting U.S. v. 2.33 Acres of Land,704 F.2d 728 (4th Cir. 1983)). Ultimately, the trial justice makes a credibility determination regarding which evidence is more convincing.Warwick Musical Theatre, Inc., v. State, 525 A.2d 905 (R.I. 1987).
In the case at bar, the Court has been presented with two conflicting appraisals of the Property's estimated FMV. Andolfo prefaces his report by noting that his written estimate is a restricted use appraisal, and as such, may be suitable only for his client's eyes since more information may be needed by third parties for a proper understanding of the report's contents and/or conclusions. Andolfo Report at 4. Next, Andolfo indicates that since the appraisal was of a vacant parcel, "only the Direct Sales Comparison Approach was considered applicable and relevant. . . ." Id. Accordingly, after a brief discussion of the Property, the surrounding community, and the Property in relation to the surrounding community, Andolfo opined that the `highest and best use' of the Property would be for "multi-family residential construction or small neighborhood retail/commercial use." Id. At 6. Andolfo then briefly outlined three comparable sales of properties making various adjustments for differences between the Property and the comparable sales. The comparable sales used by Andolfo are as follows:
Comparable sale number one ("comp #1") was a 4,500 square foot lot located at 81 Bergen Street in the City of Providence which sold for $20,000 at an un-adjusted $4.44 per square foot. After making several adjustments, Andolfo estimated that the adjusted price per square foot of comp #1 was $4.34 per square foot. Comparable sale number two ("comp #2") was a 5,460 square foot lot located at 1321 Smith Street in the City of Providence which sold for $20,000 at an un-adjusted $3.66 per square foot. After making several adjustments, Andolfo estimated the adjusted price per square foot of comp #2 to be $4.10. Finally, comparable sale number three ("comp #3") was a 4,000 square foot lot located at an unstated address on Nelson Street in the City of Providence which sold for $18,000 at an un-adjusted $4.50 per square foot. After making several adjustments, Andolfo estimated the FMV of comp #3 at $4.59 per square foot. Ultimately, Andolfo briefly states that after "reconcil[ing] the value [of the comparable sales] at $4.35 per square foot, which is close to the mean and median indicators of value," he estimated the Property's FMV at $16,800. Id. At 8-9.
Despite Andolfo's use of the well-accepted comparable sales method, his restricted use appraisal leaves the Court to speculate as to why the comparable sales are truly comparable to the Property and, ultimately, what methodology he used to arrive at the final estimate of FMV. Specifically, while Andolfo enumerates the specific adjustments he made for qualities, such as location and time of sale, he neither provides any indication of where the comparable sales were in relation to the Property nor provides any insight into the area surrounding the comparable sales or which comparable sales were most or least similar to the Property. More troublesome, however, is the dearth of any detailed explanation regarding how the reconciled price per square foot value of the comparable sales helped Andolfo reach a final FMV of $16,800 for the Property. Again, the Court can only speculate as to what methods or criteria Andolfo employed to arrive at this figure.
Conversely, Accetta's appraisal of the Property's FMV is somewhat more comprehensive than Andolfo's. Like Andolfo, Accetta's appraisal report used the well-accepted comparable sales method for determining FMV, while unlike Andolfo, Accetta opines that the highest and best use of the Property is strictly commercial. In his report, Accetta provides slightly more detail, than did Andolfo, with respect to the reasons why the comparable sales he used were sufficiently similar to the Property. The comparable sales Accetta used are as follows:
Comparable sale number one ("comparable #1") was a 5,549 square foot lot located at 1099-1105 Atwells Avenue in the City of Providence, having sold for $38,000 at $6.85 per square foot. After making several adjustments, Accetta estimated the rounded FMV of comparable #1 to be $40,000. Comparable sale number two ("comparable #2") was a 3,488 square foot lot located at 17 Home Avenue in the City of Providence having sold for $70,000 at $20.01 per square foot. After adjustments, Accetta calculated the rounded FMV to be $43,000. Comparable sale number three ("comparable #3") was a 2,751 square foot lot located at 284 Pocasset Avenue in the City of Providence which sold for $70,000 at $25.45 per square foot. Accetta did not provide any data analyzing comparable #3's adjusted rounded value. Finally, comparable sale number four (comparable #4) was a 4,410 square foot lot located at 148 Admiral Street in the City of Providence which sold for $74,000 at $16.78 per square foot. Like comparable #3, Accetta did not analyze comparable #4's adjusted FMV.
Although Accetta's analysis of comparable sales was less than fully comprehensive, he did briefly explain why the comparable sales he used accurately reflected the Property's FMV. For instance, Accetta notes that of all four comparable sales, comparable #1 and comparable #2 were "most indicative of the subject." Accetta Report at 2. Specifically, comparable #1 was located at a "similar intersection site approximately one mile . . ." from the Property, as well as being located in a "similar but inferior market area . . ." in relation to the Property. Id. Likewise, comparable #2 was located "100 yards from the subject" and was a property with which Accetta was "familiar with . . . having rented an adjacent property and appraised an abutting property." Id. The Court finds such comparables persuasive. Additionally, while Accetta did not adjust the values of comparables #3 and #4, he did, however, note that the former was located on a "corner site in [a] similar market area approximately three miles [from the Property]," while the latter was located on a "corner site on a busy commercial street; approximately three miles [from the Property]." Id. Additionally, Accetta briefly discussed the market at the time of the making of his report, as well as the Property having recently been placed on the market at a FMV of $45,000. The Court finds such a market analysis convincing. After discussing how the location of the Property, as well as the potential for constructing a building on it as vacant would affect the Property's FMV, Accetta estimated, based on his "experience of over 37 years" that the FMV of the Property was $41,500.
Finally, and significantly, the testimony of Michael O'Brian, the principality of plaintiff, was most compelling and persuasive. His testimony, coupled with Mr. Accetta's, absolutely rings true — as does their estimate of value.
 CONCLUSION
After conducting a careful independent review of all the evidence before it, this Court accepts Accetta's appraisal of FMV. Accordingly, this Court finds that Accetta's appraisal of $41,500 adequately represented the FMV of the Property. As such, this Court determines the FMV to be $41,500.
Counsel shall prepare an appropriate order for entry.
[1] According to Andolfo, the term, `restricted use appraisal,' is a type of appraisal report recognized by the Uniform Standards of Professionals in Appraisal Practice ("USPAP") — the leading authority for rules and regulations guiding professional real estate appraisers. Specifically, the `restricted use appraisal' is "intended for use only by the client, as the report cannot be understood by third parties without additional information as contained within the work file of this project." Andolfo Report at 4.