### Richard J. CONTI

v.

### RHODE ISLAND ECONOMIC DEVELOPMENT COR-PORATION et al.

**No. 2004–109–Appeal.**

Supreme Court of Rhode Island.

July 11, 2006.

Lauren E. Jones, Esq., Providence, for Plaintiff.

Randolph L. Smith, Esq., for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

On May 28, 1996, the Rhode Island Economic Development Corporation (EDC), a public instrumentality empowered to acquire property by exercise of the right of eminent domain in a manner prescribed by G.L.1956 § 42–64–9 (the EDC condemnation statute), condemned a parcel of land on Douglas Pike in Smithfield, Rhode Island, otherwise designated as Assessor's Plat 49, lot No. 71 (the subject parcel or the property). The previous owner of the property, Richard J. Conti (plaintiff), filed a petition in Superior Court contesting the adequacy of the $158,000 condemnation award. The plaintiff now appeals from a judgment dismissing his petition based on the trial justice's finding that Mr. Conti has received just compensation for the taking. For the reasons set forth herein, we affirm.

## I

### Facts and Procedural History

Mr. Conti originally purchased the subject parcel on March 7, 1990, for $135,600. The land is largely vacant, containing only a single-family house and several ancillary structures, and has access to pertinent public utilities. The character of the triangular-shaped parcel, which includes 3.88 acres of rolling topography and an intermittent stream, is secondary in importance to its location. The property fronts Douglas Pike for approximately 630 feet and is located diagonally opposite Bryant University. On its northerly side, the subject parcel is adjacent to the entrance to the so-called Island Woods Corporate Office Park (the corporate park), a 130–acre master-planned light industrial and office development.

Although the corporate park claimed only one tenant at the time of the taking,[1] two newspaper articles surfaced in December 1995 that reported a possible relocation of a division of Fidelity Investments (Fidelity) from Boston, Massachusetts, to Smithfield, Rhode Island, at some

---

1. The tenant was Alpha Beta Technologies.

point in the near future.[2] A short article published on December 12, 1995, indicated that then Governor Lincoln Almond was planning "to announce a significant economic development initiative" that morning. *Mutual fund giant reportedly moving big office to Smithfield industrial park*, The Providence Journal, Dec. 12, 1995 at B.01. Forecasting the subject of the governor's announcement, the article relied upon two anonymous sources who said that Fidelity was planning to open a large office at the corporate park in Smithfield. Id. Another article, published on December 25, 1995, reported that "state officials proudly gathered in the governor's office to announce that in two to three years, Fidelity * * * would be coming to Smithfield with 1,000 jobs." *Amid job losses, Fidelity offers hope*, Providence Business News, Dec. 25, 1995 at 1. The December 25, 1995 article, however, did not mention the precise location in Smithfield of Fidelity's planned relocation. *See id.*

Approximately two months later, on February 8, 1996, Richard E. Stang, general counsel for the EDC, informed Mr. Conti by letter that the EDC "may" acquire the subject parcel by condemnation.

**2.** Although not relevant to the disposition of the case before us, we recount the following incident for the purpose of chronological completeness. In September 1995, a real estate broker approached Mr. Conti on behalf of a party interested in acquiring an option to purchase the subject parcel, which Mr. Conti had previously placed on the market. The terms of the option, expressed in an agreement delivered by the broker, provided an option term of approximately six months and a purchase price of $280,000. The option agreement identified a limited liability company by the name of JGTG as the optionee, with a corporate address of "c/o Peabody & Arnold." In consideration of the option, the broker presented a check, which identified Peabody & Arnold as the drawer, for $1,000. Mr. Conti ultimately rejected the offer, but did not specify his reasons for so doing.

During the early phases of trial, Mr. Conti's attorney surmised that the true identity of the interested party was actually the Rhode Island Economic Development Corporation (the EDC), and that JGTG was a "straw" corporation "created for the purpose of acquiring land to be used in conjunction with the Fidelity relocation." After a series of questions and answers peppered with defense counsel's objections, plaintiff's counsel offered the option agreement into evidence, premising: "I do not move it as an exhibit with regard to issues relating to price or an offer. So I would ask the Court to disregard the amount of the proposed purchase. That is not the probative value that I am asserting for this document." Nevertheless, defense counsel objected on relevancy grounds. In response to the relevancy query, plaintiff's counsel argued that the testimony was relevant because "it shows that the defendant took certain steps to maintain privacy, to maintain secrecy, to maintain, at best, a low profile concerning the acquisition of this property, it suggests, I think very clearly that there was certainly no scope of impending condemnation." The trial justice admitted the exhibit based on this explanation, noting that the relevancy of circumstances surrounding the option agreement may yet come to bear.

While elaboration upon the significance of the option offer may have proved probative, perhaps even more so than originally suggested by plaintiff's counsel, there is no indication in the record that plaintiff later sought to elicit the testimony of the broker, attempted to establish a link between the EDC and JGTG, or otherwise pursued the matter beyond the narrative accounted above. Further, although plaintiff's pre-briefing statement submitted to this Court assigned error to the trial justice's failure to consider the evidence surrounding the option offer, plaintiff declined to advance that argument in his brief or at oral argument. Because plaintiff has failed to brief this argument pursuant to Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure, and because facts necessary for its disposition were not fully established at trial, we deem the argument, however viable it may have been, waived. *See, e.g., Catucci v. Pacheco*, 866 A.2d 509, 515–16 (R.I.2005) (holding that the failure to brief an argument, or raise it at oral argument, resulted in waiver).

As Mr. Stang noted, the letter served to notify Mr. Conti that certain of the EDC's representatives or agents would contact him over the next several days to discuss the details of the possible taking. Mr. Stang also indicated that the EDC had contracted with the Rhode Island Department of Transportation (RIDOT) to use the services of certain of its employees, presumably for purposes of appraising the subject parcel. The February 8, 1996 letter, however, did not refer to Fidelity or the planned relocation associated with it.

Later, in a letter dated April 12, 1996, Robert P. Fox, Jr. of Peabody & Arnold informed Mr. Conti that the law firm represented the EDC "in connection with the EDC's acquisition of certain real property and construction of a project in Smithfield, Rhode Island." The letter went on to recount a dialogue that does not otherwise appear in the record:

> "As Richard Stang of the EDC and I discussed with you several days ago, it is *expected* that the EDC will take the referenced property by eminent domain pursuant to the condemnation powers granted to the EDC * * *."

> "This letter is to confirm the EDC's offer of $158,000 as compensation for the value of the [subject parcel] taken * * *. The EDC's offer is based upon the fair market value for the [subject parcel] as set forth in an appraisal performed on behalf of the EDC." (Emphasis added.)

The letter provided pertinent contact information if Mr. Conti determined that the condemnation award was acceptable, and concluded by describing the procedure for contesting the amount of condemnation damages if the property ultimately was condemned. Mr. Fox, however, did not explain, in his letter at least, the nature of the "project" for which Mr. Conti's property was "expected" to be condemned.

On May 28, 1996, the EDC filed a petition in Superior Court to condemn the subject parcel along with four other parcels not at issue in this case that were adjacent to or in the immediate vicinity of the corporate park in Smithfield. The petition identified Mr. Conti as the owner of record of the subject parcel, provided a brief description of the property, and indicated that the appraised value of the subject parcel was $158,000, which amount the EDC estimated to be just compensation for the taking. General statements included in the petition, which were applicable to all parcels taken, noted that the board of directors of the EDC (the board) had adopted certain resolutions in which the board:

> "(a) determined that the acquisition by the [EDC] of certain property or interest therein in Smithfield, Rhode Island, as more fully described in the [resolutions], was necessary for the acquisition, construction or operation of a project by the [EDC], and (b) authorized the chairperson or the vice-chairperson of the [EDC] to acquire the interests in the real properties described in the [resolutions] by means of a taking by eminent domain pursuant to the [EDC's] powers under the Condemnation Statute."

Although the photocopy of the EDC's petition that plaintiff admitted into evidence did not include the resolutions referenced therein or otherwise describe the "project," subsequent language in the general statements indicated that the EDC had, in fact, attached a copy of the resolutions to the original petition submitted to the Superior Court on May 28, 1996. The Superior Court granted the EDC's petition on the day it was filed, ordering that the EDC deposit with the registry of the court the aggregate appraised value of the properties and interests taken by eminent domain, from which amount the court would release $158,000 to Mr. Conti in accor-

dance with the EDC condemnation statute.[3]

On June 20, 1996, Mr. Fox again contacted Mr. Conti by letter, this time officially notifying him that the EDC had taken the subject parcel by eminent domain pursuant to an order of the Superior Court on May 28, 1996. Mr. Fox also enclosed a copy of the resolutions referenced in the petition with the letter. The resolutions, which bear a collective adoption date of May 28, 1996, purported to authorize executive action concerning the planned relocation of Fidelity. The first resolution authorized the "Chairman and/or Executive Director * * * to enter into, execute, deliver and perform certain agreements" with Fidelity:

"such that [Fidelity] shall lease and make improvements upon that certain property of the [EDC] (currently owned and hereafter acquired, at and adjacent to the [corporate park] in the Town of Smithfield, Rhode Island) to locate substantial business operations of Fidelity to the State of Rhode Island, thereby furthering the purposes of the [EDC] by promoting and encouraging the preservation, expansion, and sound development of new and existing industry, business, commerce, and recreational facilities in the State of Rhode Island * * *."

The same resolution referred to the undertaking as the "Fidelity Project," defined as follows:

"[T]he acquisition and development of real property in Smithfield, Rhode Island by the [EDC]; agreements between the [EDC] and Fidelity with respect to the location of substantial business operations of Fidelity to the State of Rhode Island; and any and all other actions in furtherance of such location of substantial business activity of Fidelity to the State of Rhode Island and actions related thereto taken by the [EDC] * * *."

Subsequent resolutions authorized specific actions concerning the Fidelity Project, which actions included, but were not limited to, the execution of a lease agreement with Fidelity and financing arrangements with Fleet National Bank. The resolutions also identified the condemnation of the subject parcel, along with that of the other four parcels, "as an integral part of and in furtherance of the Fidelity Project."

On August 15, 1996, Mr. Conti filed a petition in the Superior Court under the EDC condemnation statute contesting the adequacy of the condemnation award.[4] Before trial, the EDC sought to exclude the expert testimony of plaintiff's real estate appraiser, Thomas S. Andolfo, by

---

**3.** The EDC indicated in its petition that according to its estimates fair compensation taken together for the five condemned parcels amounted to $480,700.

**4.** In addition to his request for an assessment of damages (count 1), Mr. Conti alleged the following: that the EDC exceeded its constitutional and statutory authority in condemning properties adjacent to the Fidelity Project purportedly for a public use (count 2); that the EDC deprived plaintiff of property without due process of law in violation of the federal and state constitutions (count 3); that the EDC failed to comply with, and was therefore in violation of, the Rhode Island Admin-

istrative Procedures Act, G.L.1956 chapter 35 of title 42 (count 4); and that plaintiff was aggrieved by the unfair and unjust decisions of the EDC (count 5). At the close of evidence, the EDC moved to dismiss counts 2 through 5, arguing that the case had been tried with respect to count 1 only (assessment of damages). With agreement from the parties, the court dismissed counts 4 and 5. Further, the court found that Mr. Conti had not met his burden of proof concerning counts 2 and 3, which the court accordingly dismissed over plaintiff's objection. The plaintiff does not challenge the dismissal of counts 2 and 3 on appeal.

means of a motion *in limine*. The EDC explained that Mr. Andolfo would predicate his opinion upon an alleged enhancement in the subject parcel's market value attributable to the public announcement of Fidelity's planned relocation. To support its motion, the EDC argued, with citation to applicable case law, that the alleged enhancement in value upon which Mr. Andolfo relied in appraising the subject parcel was barred, as a matter of law, as a means of calculating market value. On the first day of trial, November 14, 2002, the trial justice considered the issue raised in the EDC's motion but reserved his ruling pending a review of the EDC's supporting documents. The next day, the trial justice denied the motion, noting:

> "This is a non-jury matter. I would just as soon allow the testimony to come in. I think the defense's continuing right to object are appropriate, and as we discussed, if the Court determines on the facts, as this case unfolds, that his testimony is inappropriate based on the law and based on the facts as I find them to be, that the Court will do what it is supposed to do which will be disregard that testimony and the evidence."

With preliminary matters having been addressed, the trial continued over the next several days with each side advancing alternative valuation opinions through expert testimony. The plaintiff's counsel solicited lengthy testimony from Mr. Andolfo, over defense counsel's repeated objections, concerning the market value of Mr. Conti's property on the day it was condemned. In calculating the subject parcel's market value, Mr. Andolfo primarily relied on two essential and related premises. The first premise, which was the subject of the EDC's earlier motion *in limine*, posited that the pre-condemnation public disclosure of Fidelity's planned relocation, which surfaced in two newspaper articles in December 1995, inflated the market value of the subject parcel. The second premise, which Mr. Andolfo built upon the first, was that the most advantageous and valuable use to which the subject parcel could be put was as a medical office facility. With these premises in mind, Mr. Andolfo (1) identified, in his opinion, six similarly situated and comparable property sales (comparables), (2) reconciled the sales price range of the six comparables with the hypothetical sale of the subject parcel (adjustments), and (3) determined that the subject parcel, on May 28, 1996, carried a market value of $600,000.

Defense counsel presented three alternate comparables through the expert testimony of Paul Edwin Vincent, a review appraiser for the RIDOT.[5] Unlike Mr.

---

5. The Rhode Island Department of Transportation (RIDOT) conducts tiered and oftentimes simultaneous appraisals of parcels under threat of condemnation. During trial, Ann Hollands, the administrator of the RIDOT's real estate section, explained that the RIDOT's appraisal process consists of both primary and review appraisals. The primary appraisal is conducted by either a fee appraiser or a staff appraiser, depending on the complexity of a given appraisal or the volume of appraisals before the RIDOT at a given time. As the names suggest, a staff appraiser is an employee of the RIDOT, and a fee appraiser conducts an appraisal on behalf of the RIDOT for a fee. The primary appraisal· conducted by either type of appraiser then is evaluated by a review appraiser, who ultimately is responsible for determining the market value of the subject parcel. Paul Edwin Vincent, defendant's expert witness, explained his role as a review appraiser during trial: "[a r]eview appraiser basically replicates the steps of an appraiser in researching real estate for market value determinations and then approves or disapproves appraisal reports submitted to him by appraisers staff or outside appraisers and basically has the obligation to set the market value determination for the State." Those steps, Mr. Vincent continued, involve the same substantive anal-

Andolfo, Mr. Vincent considered that the highest and best use of the subject parcel was as a vacant, industrially zoned lot ready for development. Further, Mr. Vincent testified that, in his review appraisal, he did not consider an enhancement in the market value of the subject parcel attributable to any pre-condemnation public disclosure information concerning Fidelity. Mr. Vincent's proffered comparables, accordingly, differed from those relied upon by Mr. Andolfo and led Mr. Vincent to conclude that the market value of the subject parcel on May 28, 1996, was $158,000.

At the close of the evidence, the trial justice requested posttrial memoranda from the parties and took the matter under advisement, issuing a written decision on June 26, 2003. In his decision, as a threshold matter, the trial justice rejected Mr. Andolfo's opinion that the subject parcel was entitled to an increment in market value solely attributable to the public precondemnation disclosure that Fidelity eventually would become a tenant at the corporate park in Smithfield. With reference to a rule of law known as the scope-of-the-project rule and with a citation to an opinion of this Court in *Fuller v. Rahill,* 120 R.I. 832, 391 A.2d 103 (1978), the trial justice found:

"That the acquisition of the subject property was at all times within the Scope of the Fidelity Project as outlined and announced by the defendant EDC [in the condemnation petition and attached resolutions] * * *."

"That the argument of the plaintiff Conti for an enhanced valuation of $600,000.00 leased [*sic*] on the announcement of the Fidelity Project— with respect to the subject property was contrary to the facts and law in this case."

"* * *"

"That the expert testimony of the plaintiff's expert Thomas Andolfo, that the value of the subject property of $600,000.00 for a medical office building based on the enhancement value of the subject property by the Fidelity Project, shall not be considered by the Court as relevant, probative and material in this case."

The trial justice continued his decision by summarizing at length the testimony of the parties' expert witnesses. Prefacing his description of the parties' respective comparables, the trial justice said:

"The Court has already ruled that this testimony of Mr. Andolfo was based on an enhanced value of the subject property which this Court has ruled cannot be enhanced by the Fidelity project so called, because the subject property was within the scope of the initial project. Mr. Andolfo had also testified that the value of the subject property without enhancement by the Fidelity project would be $427,000.00, and its highest and best use would be a general office building." [6]

ysis employed by the primary appraiser, whether internal or external, and include "research[ing] the market, research[ing] the site, investigat[ing] town records in regard to comparable sales and all matters pertaining to the value of the property." The review appraisal and the primary appraisal, Mr. Vincent noted, typically are conducted concurrently.

In this case, staff appraiser John Paul Ryan, whom plaintiff's counsel called as an adverse witness, conducted the primary appraisal of the subject parcel, while Mr. Vincent conducted the concurrent review appraisal. Based on the testimony above, the trial justice found that Mr. Vincent made his own findings and recommendations irrespective of Mr. Ryan's, and thus the court proceeded to evaluate the merits of the review appraisal despite plaintiff's attempt to criticize the primary appraisal by calling Mr. Ryan as an adverse witness.

6. During direct examination by plaintiff's counsel, Mr. Andolfo testified that, assuming

The trial justice then began to sift through and evaluate the evidence that the experts relied upon in reaching their respective conclusions. Set forth in a series of findings, the trial justice accepted Mr. Vincent's opinion that the real estate market condition in Smithfield was "at best flat or declining," endorsed his opinion about highest and best use, approved of his comparables, despite documented imperfections, and, therefore, adopted his market value determination. While recognizing Mr. Andolfo's strong credentials, the trial justice was not persuaded by his opinion in this case. The trial justice drew particular attention to deficiencies in plaintiff's comparables concerning location and market conditions, and further noted:

> "It is obvious that the analysis of the six comparables was made in expectation that a medical office building was the highest and best use of the subject property. Once the determination was made that the enhancement theory espoused by the plaintiffs was not successful, the sites selected by the plaintiff lost their probative value when contrasted with the location of the subject property and the market conditions in the area of this location."

Consequently, the trial justice found, by a preponderance of the evidence, that $158,000 represented fair compensation for the subject parcel and, therefore, dismissed plaintiff's petition. Judgment entered on September 30, 2003, and plaintiff timely appealed.

## II

### Discussion

### A. Standard of Review

■ "When reviewing the decision of a trial justice sitting without a jury in a land-condemnation proceeding, this Court accords great weight to the trial justice's findings. Consequently, we shall not disturb such findings on appeal unless it is demonstrated that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong." *Mastrobuono v. The Providence Redevelopment Agency of Providence*, 850 A.2d 944, 946 (R.I.2004) (quoting *Serzen v. Director of the Department of Environmental Management*, 692 A.2d 671, 675 (R.I.1997)).

### B. Value Enhancement

The parties apparently agree, on appeal at least, that the scope-of-the-project rule does not apply to the facts presented in this case, but disagree over the necessary consequence of that conclusion. The plaintiff argues that, irrespective of the applicability of the scope-of-the-project rule, the trial justice committed reversible error by ignoring the effect of the state's "announcement" that Fidelity planned to relocate part of its operations to the corporate park in Smithfield. The plaintiff contends that the enhanced market value of the subject parcel attributable to that "announcement," which plaintiff ascribes to the two newspaper articles published in December 1995, should have been reflected in Mr. Conti's condemnation award as a proper measure of fair compensation. The EDC responds that, as a matter of law, Mr. Conti cannot benefit from an enhancement in market value based merely on newspaper articles that did not constitute a government announcement of the project; rather, the only government action here was the filing of the condemnation proceedings, at which point it was proper to determine the scope of the pro-

---

the subject parcel could not benefit from its proximity to Fidelity's relocation, the subject parcel's highest and best use would be as a general professional office building, and would, in that instance, carry a market value of $427,000.

ject. In the alternative, the EDC asserts that, assuming *arguendo* that the law permitted the inclusion of such an enhancement in calculating market value, plaintiff failed to establish its existence at trial through competent evidence, *i.e.*, similarly situated and comparable sales that reflected an increment in market value because of the Fidelity Project.

The marked terminological confusion at trial surrounding the scope-of-the-project rule persuades us to begin our analysis by briefly surveying the general principles involved in this case, out of which principles we first may isolate, and then ultimately dispose of, the applicability of the scope-of-the-project rule. We then address whether, or to what extent, the subject parcel may, under law, benefit from the enhancement that Mr. Conti alleges.

█ Article 1, section 16, of the Rhode Island Constitution provides that "[p]rivate property shall not be taken for public uses, without just compensation." This Court has referred to this textually embedded constitutional restriction, which presupposes the state's power to take private property in the first instance, as "the

safeguard in our State constitution of property rights in condemnation proceedings." *Joslin Manufacturing Co. v. Clarke*, 41 R.I. 350, 357, 103 A. 935, 937 (1918). Parallel language in the Fifth Amendment to the United States Constitution also prohibits state actors, by operation of the Due Process Clause of the Fourteenth Amendment, *Kelo v. City of New London, Connecticut*, — U.S. —, —, 125 S.Ct. 2655, 2672, 162 L.Ed.2d 439 (2005) (O'Connor, J., concurring), from taking private property for the "public use" unless accompanied by "just compensation." Because our focus in the present case concerns only the "just compensation" component of the aforementioned constitutional provisions, we proceed to examine the requirements of that safeguard alone.[7] *Cf. Rhode Island Economic Development Corp. v. The Parking Co., L.P.*, 892 A.2d 87, 95 (R.I.2006) (holding that, of the two issues that are pertinent in eminent domain cases, the issue of public use was appealable, but the issue of just compensation was not before the Court).

Because "just compensation" is the only textual standard against which the federal

---

7. Although plaintiff's brief questions whether the EDC's taking was a legitimate "public use," he does so only in an attempt to distinguish the circumstances in this case from those in *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), the seminal scope-of-the-project-rule case that we discuss in greater depth *infra*. The plaintiff argues that: because the condemnees' respective properties in *Miller* and its progeny were taken for traditionally recognized public projects, *i.e.*, roads, parks, and reservoirs, and because, in the present case, "Conti lost his *private* property to a *private* business to boost its *private* profits," therefore, "Conti's case does not fit within the isthmian confines of the [scope-of-the-project] rule." Further, in a footnote to his argument distinguishing *Miller*, plaintiff cites an opinion of the Supreme Court of Connecticut in *Kelo v. City of New London*, 268 Conn. 1, 843 A.2d 500, 528 (2004), which held that a taking for economic

development constituted a valid "public use" under the Takings Clause. The United States Supreme Court issued a writ of certiorari to the Supreme Court of Connecticut in *Kelo v. City of New London, Connecticut*, 542 U.S. 965, 125 S.Ct. 27, 159 L.Ed.2d 857 (2004); but, by the time plaintiff submitted his brief to this Court in the matter before us, Justice Stevens had yet to pen what would become the controversial majority opinion upholding the constitutionality of the taking in *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). However, the limited context in which plaintiff raises the issue of "public use" persuades us that, to the extent that plaintiff even intended to raise the "public use" component of the EDC's taking as an independent argument on appeal, the matter is not properly before us. *See, e.g., Catucci*, 866 A.2d at 515–16; *Hay v. Pawtucket Mutual Insurance Co.*, 824 A.2d 458, 460 n.2 (R.I.2003).

and state constitutions require a condemnation award to be measured, *see United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950), this Court has adopted a series of working rules to determine in practice what that ephemeral standard requires. For instance, we have held that "the measure of the constitutionally required 'just compensation' due a property owner whose land has been taken by eminent domain is the fair market value of the property." *J.W.A. Realty, Inc. v. City of Cranston*, 121 R.I. 374, 380, 399 A.2d 479, 482 (1979). With reference to an authoritative treatise on the subject, we have defined fair market value as "the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it * * *." *Id.* (quoting 4 Nichols, *The Law of Eminent Domain* § 12–2[1], at 12–71 to 81 (rev.3d ed. Sackman 1978)). As a corollary to our definition, we have determined that fair market value should be calculated on the basis of the most advantageous and valuable use of the property, sometimes referred to as its highest and best use. *Ocean Road Partners v. State*, 612 A.2d 1107, 1110 (R.I.1992). Further defining the contours of our working rule, we have adopted the comparable-sales method as the preferred methodology in which to calculate fair market value, *e.g., Capital Properties, Inc. v. State*, 636 A.2d 319, 321 (R.I.1994), and we have indicated that the date of the taking is the proper time to perform that calculation. *E.g., Serzen*, 692 A.2d at 673.

 This Court, nevertheless, assigns no talismanic significance to fair market value itself beyond its use as a tool in ascertaining "just compensation." *See, e.g., Warwick Musical Theatre, Inc. v. State*, 525 A.2d 905, 910 (R.I.1987) (holding that it was not an abuse of discretion for a trial justice to consider evidence beyond comparable-sales data when the fair market value calculated from that data failed to achieve "just compensation"). In this regard, we have accentuated in our case law "the fundamental proposition that just compensation is the court's ultimate objective." *J.W.A. Realty, Inc.*, 121 R.I. at 381, 399 A.2d at 483. Thus, our conventional working rules bow, as they must, to the "ultimate objective" that one who challenges the adequacy of a condemnation award should not receive a measure of compensation that in any way exceeds, or falls short of, "just compensation." *See, e.g., Corrado v. Providence Redevelopment Agency*, 117 R.I. 647, 657, 370 A.2d 226, 231 (1977); *Nasco, Inc. v. Director of Public Works*, 116 R.I. 712, 721, 360 A.2d 871, 876 (1976).

Similar refinement to the concept of fair market value was responsible for the genesis of the scope-of-the-project rule, a precept much belabored in this case, in *United States v. Miller*, 317 U.S. 369, 376–77, 63 S.Ct. 276, 87 L.Ed. 336 (1943). *Miller* involved the condemnation of the respondents' land in connection with a government project involving the relocation of railroad right-of-ways. *Id.* at 370–71, 63 S.Ct. 276. During trial, the respondents sought to elicit opinion testimony concerning the fair market value of the land taken as of December 1938. *Id.* at 372, 63 S.Ct. 276. Government counsel objected to the form of the question, arguing that the respondents were not entitled to any increment in value that may have occurred as a result of the government's earlier commitment to the project, which involved condemning lands adjacent to the respondents' property. *Id.* Sustaining the government counsel's objection, the trial court directed that the question be reframed to call for the market value of the land at the time of the taking, but excluding any increase in value accruing between August

1937, when Congress authorized the project, and December 1938, when the government condemned the respondents' lands. *Id.*

Upon appeal, the Supreme Court began by framing the central issue before it: whether an owner should benefit from an increment in value added to the subject parcel by the action of the government in previously condemning adjacent lands. *Miller*, 317 U.S. at 375, 63 S.Ct. 276. In addressing the issue, the Supreme Court noted, "strict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case." *Id.* Such was the case before the Supreme Court in *Miller*, the holding of which we quote at length:

> "If a distinct tract is condemned * * * other land in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement."

> "The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities." *Id.* at 376–77, 63 S.Ct. 276.

Applying these principles to the facts before it, the Supreme Court determined that the government was committed to the project in August 1937, when it had obtained final and definite authorization from Congress. *Miller*, 317 U.S. at 377, 63 S.Ct. 276. At that time, the respondents' lands were only one of several probable routes for the relocation of the railroad right-of-way, causing any possible increase in value to their lands to be merely speculative. *Id.* Consequently, the Supreme Court held that the trial court properly instructed the jury that the respondents could not profit from the condemnation's eventuality, in 1938, under compulsion of "just compensation." *See id.* at 377–79, 63 S.Ct. 276. Perceiving no error in the trial court's instructions, the Supreme Court affirmed the compensation award that excluded any increment in value derived from the respondents' beneficial proximity to lands previously condemned. *See id.* at 372–73, 382, 63 S.Ct. 276.

The circumstances surrounding the condemnation in the present case, however, simply do not equate with those inherent in *Miller* and its progeny. It appears to us that scope-of-the-project-rule cases often involve drawn out governmental projects, piecemeal takings separated by noticeable gaps in time, and some evidence that, in the interim, the market values of neighboring properties increased because

of the projects. *See United States v. 320.0 Acres of Land More or Less in Monroe, Florida,* 605 F.2d 762, 781–93 (5th Cir. 1979) (providing a thorough history of the federal jurisprudence addressing the scope-of-the-project rule); *see also, e.g., United States v. Reynolds,* 397 U.S. 14, 14 n. 1, 17–18, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970) (reaffirming the holding annunciated in *Miller* in similar circumstances); *Miller,* 317 U.S. at 370–72, 63 S.Ct. 276; *Fuller,* 120 R.I. at 833–39, 391 A.2d at 103–06 (adopting and applying the holdings of *Miller* and *Reynolds* in a condemnation dispute involving a lengthy government project in which adjacent lands were condemned at different times and evidence that the government project enhanced the value of the surrounding property).

■ The disposition of the present case calls for discourse addressing a related but more fundamental rule of law. We look to the observation of an authoritative treatise for guidance: "[t]he general rule is that any enhancement in value that is brought about in anticipation of, and by reason of, a proposed improvement, is to be excluded in determining the market value of the land." 4 *Nichols on Eminent Domain* § 12B.17[1] at 12B–202 (3d ed. Julius L. Sackman 2005) (citing *Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893); *Kerr v. South Park Commissioners,* 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924 (1886)). We adopted this general rule in *Rhode Island Hospital Trust Co. v. Providence County Court House Commission,* 52 R.I. 186, 189, 159 A. 642, 643 (1932), a case that involved a taking by eminent domain of certain land needed for the construction of the building in which this Court now sits. *Id.* at 187, 159 A. 642. There, the petitioners argued that the trial justice should not have excluded testimony indicating that the market value of their properties increased as

soon as the General Assembly authorized the condemnation of those properties. *Id.* at 189, 159 A. at 643. This Court affirmed the Superior Court's ruling, holding that the petitioners could not benefit from the fact that "the land was known to be within the area designated for condemnation and was certain to be taken." *Id.; see also J.W.A. Realty, Inc.,* 121 R.I. at 382 n. 5, 399 A.2d at 483 n. 5 (noting, with citation to *Rhode Island Hospital Trust Co.,* that the general rule, quoted *supra,* "applies in Rhode Island"); *Fuller,* 120 R.I. at 840, 391 A.2d at 107 (declining to consider the question, separate from the primary scope-of-the-project-rule issue, of whether the value of the petitioner's property was enhanced by the condemnation of adjacent lands under the auspices of the project because "the owner is not entitled to benefit from the known fact that her property probably would be condemned").

■ The rule articulated in *Rhode Island Hospital Trust Co.,* however, does not detract from the long-standing principle that fair market value, calculated at the time of the taking, is generally the proper measure of "just compensation." We deduce this principle from the teachings of *In re Condemnation of Certain Land for a New State House,* 19 R.I. 382, 33 A. 523 (1896) (*New State House*). There, a board of statehouse commissioners (the board) who were responsible for selecting and acquiring land for the construction of a new statehouse, condemned certain properties adjacent to land that the board already purchased for the project. *Id.* at 382–83, 33 A. at 523. Separately-appointed commissioners awarded the condemnees damages that reflected a heightened market value created by their proximity to the development, and the board then appealed to this Court. *Id.* at 383–84, 33 A. at 523. The board contended that "the rule of appraisal is that the own-

er is not entitled to the increased value of the land occasioned by the proposed improvement." *Id.* at 385, 33 A. at 524. We disagreed with the board's argument as too broadly stated, *id.*, and held that the public disclosure that the board had purchased land for the new statehouse enhanced the market value of adjacent properties before the takings commenced:

"The fact of the location of the new state house had thus become publicly known, by the purchase by the State of this tract, prior to the filing of the [condemnation] certificate by the [board], and the consequent enhancement in value due to the proposed improvement had already accrued to the adjacent land before the certificate was filed." *Id.* at 386, 33 A. at 524.

Consequently, we refused to order a new trial at the request of the board and let the appraisal of the commissioners stand. *Id.* at 386–87, 33 A. at 524.

In the case under review, the terminology of the trial justice's findings supports the conclusion that the trial justice applied the scope-of-the-project rule to the facts in the present case. The trial justice's preliminary findings provided that "the acquisition of the subject property was at all times within the Scope of the Fidelity Project as outlined and announced by the defendant EDC." Nevertheless, with reference to the EDC's condemnation petition and attached resolutions, the trial justice used May 28, 1996, the date of the actual condemnation, as the operative date for determining just compensation. Thus, the date upon which he determined that the EDC became committed to the project, thereby delineating the "scope of the pro-

ject," and the date of the taking itself were one and the same. Citing this Court's adoption, in *Fuller*, of the scope-of-the-project rule, the trial justice then concluded that Mr. Andolfo's primary opinion concerning enhanced market value ($600,000) and the subject parcel's highest and best use (medical office facility) was not relevant, probative, or material.

The appropriate inquiry, however, was not whether Mr. Conti's property fell within the scope of the project as of the date of condemnation. The question in this case, rather, should have been whether the subject property increased in value from the time that the real estate market became aware of Fidelity's relocation to Smithfield until the time said parcel "was known to be within the area designated for condemnation and was certain to be taken." *Rhode Island Hospital Trust Co.*, 52 R.I. at 189, 159 A. at 643; *see also* 4 *Nichols on Eminent Domain* § 12B.17[2] at 12B–215. If so, any such increase in value is properly compensable pursuant to *New State House*, 19 R.I. at 386, 33 A. at 524. However, any enhanced value occurring after the date that the property was "known" to be slated for condemnation is not a proper component of just compensation. *See Rhode Island Hospital Trust Co.*, 52 R.I. at 189, 159 A. at 643.

Although the Superior Court decision may not have stated accurately the applicable principles of value enhancement, we are not convinced that the decision should be reversed. Nor do we need to question the trial justice's determination that May 28, 1996 was the appropriate triggering date for his fair market value analysis.[8] Assuming without deciding that the mar-

---

8. Because the trial justice determined fair market value as of the date of the taking itself, we need not address, for purposes of deciding this appeal, the question of when it was "known" that the property was "within the

area designated for condemnation." *Rhode Island Hospital Trust Co. v. Providence County Court House Commission*, 52 R.I. 186, 189, 159 A. 642, 643 (1932).

ket adequately was aware of the details of the Fidelity Project as early as December 1995, plaintiff nevertheless failed to satisfy his burden of proving, through competent evidence, the existence of *any* enhancement in the value of his property that could be attributed to such awareness. The plaintiff's failure in this regard is reflected in the trial justice's subsequent findings. As a result of his preliminary findings concerning value enhancement, the trial justice looked to Mr. Andolfo's alternate opinion when he testified that, absent an enhancement in value caused by the Fidelity Project, the subject parcel's highest and best use would be as a general professional office building, and would, in that instance, carry a market value of $427,000. The trial justice then proceeded to evaluate the witnesses' respective comparables and competing conclusions. In doing so, the trial justice made several findings that independently supported the court's determination ultimately to embrace Mr. Vincent's opinion and to reject Mr. Andolfo's.

Because we base our holding in this regard on the independent and subsequent findings of the trial justice concerning the assessment of the witnesses' comparables, we proceed to analyze those findings, and, as a matter of course, plaintiff's assignment of error to them.

### C. Comparable–Sales Data

The plaintiff advances three particular arguments in asserting, overall, that the trial justice committed reversible error in accepting Mr. Vincent's comparables. First, while conceding that the comparable-sales method is generally the best gauge of fair market value, plaintiff argues that sales data must, as a preliminary matter, be obtainable in the market. At the time of the taking, he argues, properties surrounding the subject parcel were either: (1) zoned residential and thus not

similarly situated; or (2) owned by only a handful of owners who wished to retain their land for later development. This, he asserts, made it difficult for him to find local data of comparable sales and therefore plaintiff was forced to search distinct and far-flung municipalities such as Providence and Portsmouth. Second, and related to that, plaintiff argues that the trial justice placed "almost dispositive" weight on the location of his expert's comparables instead of emphasizing the similar characteristics shared among them and the subject parcel. Third, given the paucity of ascertainable sales data in Smithfield, plaintiff argues that the subject parcel possessed a certain uniqueness that necessitated alternate appraisal methods beyond the comparable-sales method. Finally, plaintiff simply identifies distinguishable characteristics between Mr. Vincent's comparables and the subject parcel, concluding that the trial justice erred in accepting Mr. Vincent's analysis.

 As we explained previously, this Court has held that the comparable-sales method is the preferred way in which to ascertain fair market value. *E.g., Capital Properties,* 636 A.2d at 321. "The comparable sales methodology assumes that the best estimates of the market value of a property can be determined by analyzing recent sales in the open market during a similar timeframe for substantially similar or comparable properties, and making adjustments for minor differences between the properties or the circumstances of the sales." *Sun–Lite Partnership v. Town of West Warwick,* 838 A.2d 45, 47 (R.I.2003). "Significant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put." *Serzen,* 692 A.2d at 674 (quoting *Warwick Musical Theatre, Inc.,* 525 A.2d at 910).

■■■ Generally, existing sales data concerning similarly situated and comparable properties serve to exclude the use of other methods for deducing fair market value. *Corrado,* 117 R.I. at 654, 370 A.2d at 230. We have allowed for the departure from this preferred method, however, at the discretion of the trial justice, when the fair market value established through comparable sales did not adequately reflect "just compensation" because the condemned property was "unique or suited for a special purpose." *J.W.A. Realty, Inc.,* 121 R.I. at 381, 384, 399 A.2d at 483, 484 (apartment project with "no comparable sales that reflected [its] special characteristics"); *see also, e.g., Warwick Musical Theatre, Inc.,* 525 A.2d at 910 (structure used as a musical theater); *Trustees of Grace and Hope Mission of Baltimore City, Inc. v. Providence Redevelopment Agency,* 100 R.I. 537, 538, 543, 217 A.2d 476, 477, 479 (1966) (structure used as a religious and benevolent mission); *Assembly of God Church of Pawtucket, R.I. v. Vallone,* 89 R.I. 1, 10–11, 150 A.2d 11, 15–16 (1959) (building used as a parsonage); *Hall v. City of Providence,* 45 R.I. 167, 168–69, 121 A. 66, 66–67 (1923) (highly improved country estate that was one of the first in the area). Either way, "[t]he availability of such comparable sale is a question addressed to the discretion of the trial justice whose determination will be reversed only if 'palpably or grossly wrong.'" *Warwick Musical Theatre, Inc.,* 525 A.2d at 910 (quoting *Thomas B. Gray, Inc. v. Providence Redevelopment Agency,* 114 R.I. 370, 374, 333 A.2d 143, 145 (1975)).

Mr. Andolfo began his market-value calculation on the premise that the most advantageous and valuable use to which the subject parcel could be put was as a medical office facility. Based on the subject parcel's presumed highest and best use, Mr. Andolfo examined six real estate transactions including properties in Providence, Portsmouth, East Providence, Johnston, and Warwick. The sales prices of the six comparables ranged from $185,000 to $800,000, and from $4.31 to $13.10 per square foot. To derive a suitable amount per square foot between these two extremes, which amount Mr. Andolfo then could apply to the subject parcel, Mr. Andolfo considered a series of observations or factors, known as adjustments. Although factoring in the time of sale is a typical means of adjusting sales data, Mr. Andolfo testified that "the market was stable from '92 to '96 and no time adjustments whether negative or positive were reflected." The witness continued, however, that he considered as a positive adjustment the general location of the subject parcel, including its adjacency to the corporate park and "the fact that Fidelity investments was going to be there." Further, in his appraisal, Mr. Andolfo identified the following factors that he employed in adjusting the sales data:

"[T]he State of Rhode Island was proposing to construct a $5 million golf course adjacent to Bryant College. Similarly, there were a number of hotel proposals along various sites on Douglas Pike from Route 116 north to the subject property (one of which was developed). A Wal–Mart had been proposed for a parcel location along Route 7 opposite the 295 Office and Industrial Park (now the site of the New Life Worship Center), and the Town of Smithfield had also suggested that they [*sic*] would be a good choice as a home for the New England Patriots when considering that the Patriot[s'] summer training camp is located at Bryant College."

Based on these adjustments, Mr. Andolfo narrowed the range from $6 to $8.07 per square foot. Mr. Andolfo then reconciled the mean indicated value ($6.82 per square foot) with the median indicated value

($6.48 per square foot) to derive a value of $6.75 per square foot. Considering the subject parcel's 90,917 usable square feet, Mr. Andolfo calculated that the subject parcel carried a market value of $614,000, which, less the demolition costs associated with razing the extant residential structures, amounted to a net present value of $600,000 on the date of the taking.

Testifying for the EDC, Mr. Vincent presented three comparables based on his opinion that the subject parcel's highest and best use was as vacant, industrially zoned land with the opportunity for future development.[9] Although Mr. Vincent slightly and upwardly adjusted his comparables, he disagreed with the sheer breadth of adjustments Mr. Andolfo employed with respect to location. As Mr. Vincent indicated, all his comparable sales took place in Smithfield, two of which sales occurred within a mile of the subject parcel. Mr. Vincent said that he did not make adjustments based on future market trends, such as the prospects of Fidelity's relocation, the New England Patriots' relocation, or the construction of a $5 million golf course, because such trends were "speculative" and "may not eventuate." As Mr. Vincent explained:

> "[A]t a certain level of market, what I have called dormancy, a certain level of investigatory rigor is not called for. Adjustable components such as have been asked about during my cross-examination tends to collapse against each other * * *. [I]f you can find comparables with points of comparability, and I be-

lieve we have, those are indicative. They are market signals in a very dormant market of what's possible in the market area."

Based on his minor adjustments, Mr. Vincent estimated a value of $1 per square foot, which, when multiplied by the subject parcel's 158,285 square feet of both usable and unusable land, resulted in a rounded market value of $158,000.[10]

■■■■ Although each party presented the expert testimony of a real estate appraiser who possessed the appropriate qualifications necessary to render an opinion on the subject parcel's fair market value, the trial justice accepted Mr. Vincent's opinion and rejected Mr. Andolfo's. "A trial justice retains the authority to determine the credibility of each expert's evidence, and to decide whether to accept or reject a proffered valuation." *Sun–Lite Partnership*, 838 A.2d at 48. Both the trial transcript and the written decision reflect the detailed consideration that the trial justice afforded to each expert's testimony concerning the comparables employed in preparing the respective appraisals. The trial justice's thorough and well-articulated findings, along with our deferential review in such cases, persuade us that plaintiff's allegations of error must fail. Although sales data were not as abundant in Smithfield as in other markets, the trial justice determined that sufficient data of comparable sales existed from which the witnesses could calculate the market value of the subject parcel. Moreover, the subject parcel was not, by any

**9.** Although Mr. Vincent appears to have relied on only three comparables during his testimony at trial, the record shows the existence of five. In conducting his primary appraisal, Mr. Ryan identified three comparables referred to during the proceedings as the "Ryan report." At trial, Mr. Vincent testified that he selected only one as the "reliance" comparison, or the comparable that is most similar to

the subject parcel. The other two comparables to which Mr. Vincent testified were furnished to Mr. Vincent shortly after he conducted his review appraisal, from the so-called "Bates report."

**10.** Mr. Vincent indicated that he did not discount the subject parcel's wetlands, as Mr. Andolfo did, when calculating market value.

stretch of the imagination, "unique or suited for a special purpose," *see J.W.A. Realty, Inc.,* 121 R.I. at 381, 399 A.2d at 483, but was vacant, industrially zoned land. The trial justice appropriately evaluated the witnesses' respective comparable sales, giving due consideration to their particular location, character, proximity in time, and uses compared with the subject parcel. In the final analysis, plaintiff suffered not from an error on the part of the trial justice, but from a failure to satisfy his burden at trial to present persuasive evidence supporting his opinion of fair market value as of May 28, 1996, the date of condemnation. The trial justice simply found Mr. Vincent's comparables to be more probative than Mr. Andolfo's, and we cannot say, based on our review of the record, that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong in doing so.

### D. Highest and Best Use

The plaintiff next argues that the trial justice committed an error of law in determining that the highest and best use of the subject parcel was industrial, thereby rejecting Mr. Andolfo's opinion that the subject parcel would be more advantageously employed as a professional office building. Alternatively, plaintiff argues that the trial justice misconceived or overlooked the "boatload" of evidence supporting Mr. Andolfo's opinion about highest and best use. While acknowledging that the subject parcel was zoned industrial at the time of the taking, plaintiff explains that professional office facilities were allowed by special exception. The plaintiff contends that Smithfield's zoning board, in all likelihood, would have approved a medical office building in the area because of the board's philosophy at the time to foster a corporate environment in the area surrounding the subject parcel.

▮▮▮▮ This Court has held that "an appraiser in condemnation proceedings is allowed to consider all uses to which condemned land is or might reasonably be put. Compensation [therefore] should be based on the most advantageous and valuable use." *Sweet v. Murphy,* 473 A.2d 758, 761 (R.I.1984) (citing *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). Accordingly, "[t]he sum required to be paid the owner of land does not depend on the uses to which he has put it but is to be ascertained by just consideration of the uses for which it is suitable." *Id.* Further, this Court has "reaffirmed the principle that condemned land must be assessed according to its fair-market value in light of existing zoning restrictions and not on the basis of an unlawful use." *Ocean Road Partners v. State,* 670 A.2d 246, 250 (R.I.1996). As we have explained, however, the trial justice may consider a use for which present zoning restrictions do not readily allow if the party can establish a reasonable probability that the use will be made allowable in the near future. *Id.*

▮▮▮ In our analysis, we find it helpful to explain the nature of the evidence that the witnesses relied on in constructing their opinions about highest and best use. Explication of this evidence also brings us to plaintiff's final assignment of error, *viz.,* that the trial justice misconceived or overlooked evidence of a corporate-development trend in Smithfield. We proceed to address, therefore, the trial justice's reliance on this so-called trend evidence, or lack thereof, both as a separate assignment of error and as it relates to the disposition of plaintiff's allegations concerning the trial justice's highest and best use finding.

Both Mr. Andolfo and Mr. Vincent agreed that the subject parcel bore an industrial zoning designation at the time of

the taking, although its current use was as a residential rental property, which Mr. Andolfo described as a legal, nonconforming use. Both witnesses further agreed that the most advantageous use of the subject parcel was not residential, but they offered divergent opinions about what the highest and best use might be. Mr. Andolfo testified that public hearings conducted in early 1996 to consider a change in zone along Route 7 from industrial to planned corporate indicated that the town's "mind set" was moving toward corporate development. Because of this development trend, Mr. Andolfo concluded that the Smithfield zoning board probably would have granted a special exception for the construction of a professional office building on the subject parcel. Moreover, in his appraisal, Mr. Andolfo pointed to tacit "supply and demand factors" for medical office facilities within Smithfield, northern Rhode Island, and the Providence metropolitan area, purportedly supporting the more specific assertion that the highest and best use for the subject parcel in Smithfield was a medical office facility.

Mr. Vincent, on the other hand, testified that the subject parcel's highest and best use was "vacant and available for development as an industrial site." Further, Mr. Vincent recognized that "there were alternative uses, besides industrial, that were allowed under certain circumstances, including [professional] office [space]." As indicated in his appraisal, however, Mr. Vincent based his opinion not on evidence of any positive trend, but on the "wide attestation of a 'flat' market for the period in question" along the Route 7 corridor in Smithfield, garnered from the sheer lack of comparable-sales data. Mr. Vincent testified that prudent appraisers consider future trends in valuing property only if those trends are supported by "[h]ard data in the market." Caution is warranted, Mr. Vincent explained, "[b]ecause future trends may not eventuate[; they are] speculative. * * * So, if an appraiser hangs their hat by that, they are in dangerous territory."

In his decision, the trial justice adopted Mr. Vincent's opinion concerning highest and best use, which included the possibility that a prospective purchaser could have obtained a special exception to construct a professional office building, despite the subject parcel's designation, at the time of the taking, as industrial property. The applicable finding in the trial justice's decision states that "[t]he Court * * * adopts the theory of market condition and lack of sales activity that at the time of the taking the subject property's highest and best use was as it was zoned, industrial, *with other uses allowable upon special application * * *.*" In light of the plain language of this finding, we simply are not convinced that the trial justice *"forever ossified"* the subject property as it was zoned, as plaintiff argues, thereby dismissing the more advantageous and valuable use of the property.

Nor do we perceive that the trial justice erred in rejecting Mr. Andolfo's trend evidence and accepting Mr. Vincent's observation that the market was "flat." The trial justice chose, squarely within the margins of his discretion, to rest his ruling on evidence of proximate sales that were comparable to the subject parcel. The plaintiff had the opportunity to present comparables that reflected the development trends in Smithfield, to which trends Mr. Andolfo testified, but he failed to examine any sale actually within the boundaries of Smithfield that might have spoken to the existence of those trends. Given the absence of competent evidence in this regard, we are satisfied that the trial jus-

tice did not abuse his discretion by accepting Mr. Vincent's opinion.

### Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court, to which we remand the record in this case.